# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 8, 2012

No. 11-10338

Lyle W. Cayce
Clerk

NAIEL NASSAR, MD,

Plaintiff–Appellee/
Cross-Appellant

v.

UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL CENTER,

Defendant–Appellant/
Cross-Appellee

Appeals from the United States District Court
for the Northern District of Texas

Before REAVLEY, ELROD, and HAYNES, Circuit Judges.

REAVLEY, Circuit Judge:

Dr. Naiel Nassar, the Appellee, was a member of the faculty at Appellant University of Texas Southwestern Medical Center ("UTSW"). UTSW is affiliated with Parkland Hospital, where UTSW faculty make up most of the physician staff. Nassar served as a clinician at Parkland's Amelia Court Clinic, which specializes in HIV/AIDS treatment. Nassar claimed and a jury found that he was constructively discharged from his UTSW faculty position because of racially motivated harassment by a superior. The jury also found that UTSW retaliated against Nassar by preventing him from obtaining a position at Parkland after he resigned from UTSW. Although there was sufficient evidence

No. 11-10338

to support the jury's verdict on the retaliation claim, there was insufficient evidence of constructive discharge. We therefore VACATE in part, AFFIRM in part, and REMAND the case for reconsideration of Nassar's monetary recovery and attorneys' fees.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Dr. Naiel Nassar, who is of Middle Eastern descent, came to UTSW in 1995 to work in Parkland's Amelia Court Clinic. After three years at the Clinic, Nassar pursued additional training at the University of California at Davis. In 2001 he returned to UTSW as an Assistant Professor of Internal Medicine and Infectious Diseases and Associate Medical Director of the Clinic. His immediate supervisor was Dr. Phillip Keiser, Professor of Internal Medicine and the Clinic's Medical Director. Keiser's supervisor at UTSW was Dr. Beth Levine, whom UTSW hired in June 2004 as Chief of Infectious Disease Medicine. Levine oversaw the Amelia Clinic, but she did not work there on a daily basis.

Upon being hired, Levine began inquiring about Nassar's productivity and billing practices. In late 2005, when referring to another doctor of Middle Eastern descent, Levine said in Nassar's presence, "Middle Easterners are lazy." In the spring of 2006, in reference to the hiring of that same doctor, Levine said they have "hired another one" in Keiser's presence. Keiser interpreted this comment as indicating that Parkland had hired another "dark skin[] Muslim like Nassar," and Keiser told Nassar what Levine had said. Keiser also informed Nassar that Levine scrutinized Nassar's productivity more than that of other doctors. When Keiser presented Levine with objective data demonstrating Nassar's high productivity, Levine began criticizing Nassar's billing practices. Her criticism did not take into account that Nassar's salary was funded by a Federal grant that precluded billing for most of his services.

During this same period, Levine suggested to Nassar that he consider applying for a promotion to become an Associate Professor. Nassar started the

2

application process.   While Nassar was soliciting recommendations for his promotion, Levine told Nassar that he was unlikely to be promoted because Dr. Mumford did not like him.  Nassar later found out that Mumford was not on the Promotions and Tenure Committee ("the Committee") nor did he oppose Nassar being promoted.  At another point, Levine told Nassar that he would need to switch from UTSW's "clinical scholars track" to its "clinician track" in order to be promoted.  Nassar did this.  In reviewing Nassar's promotion application, the Committee and UTSW made a number of billing and productivity inquiries about Nassar and his work, which came back relatively positive but with a few criticisms about Nassar's frequent speaking engagements on behalf of pharmaceutical companies.   Levine also asked Keiser why Nassar wanted to stay at UTSW instead of moving back to California, where his family was.  Levine did, however, sign letters of recommendation composed by Keiser in support of Nassar's promotion.  On March 1, 2006, the Committee decided to promote Nassar, effective September 1, 2006.

Despite the eventual promotion decision, Levine's harassment led Nassar to look for a way to continue working at the Clinic without being a UTSW faculty member subject to Levine's supervision.  In 2005, Nassar began discussions with the Hospital about continuing his work in the Clinic as a Parkland staff physician rather than as UTSW faculty.  On a number of occasions before April, 2006, Nassar met with Dr. Gregory Fitz, UTSW's Chair of Internal Medicine and Levine's immediate superior, and complained that Levine and the Committee scrutinized his productivity and billing more than that of other doctors.

UTSW presented evidence indicating that longstanding practice and UTSW and Parkland's affiliation agreement obliged Parkland to fill its staff physician posts with UTSW faculty.  Nassar disputed that interpretation of the agreement and contended that some of the Parkland doctors he worked with at the Amelia Clinic were not UTSW faculty.  In any event, Parkland staff told

No. 11-10338

Nassar that if he would resign from his post at UTSW then Parkland would be able to hire him to work at the Amelia Clinic. On June 3, 2006, Parkland offered Nassar a job as a staff physician on Parkland's payroll, starting on July 10, 2006. Nassar resigned from UTSW on July 3, 2006, with a letter to Fitz and other UTSW faculty. In the letter, Nassar wrote:

> The primary reason of my resignation is the continuing harassment and discrimination against me by the Infectious Diseases division chief, Dr. Beth Levine. . . . I have been threatened with denial of promotion, loss of salary support and potentially loss of my job[.] . . . [This treatment] stems from [Levine's] religious, racial and cultural bias against Arabs and Muslims that has resulted in a hostile work environment.

Fitz opposed Parkland's hiring Nassar, asserting that UTSW had a right to fill Parkland doctor positions with UTSW faculty. The jury heard conflicting evidence regarding the timing and motivation of Fitz's opposition. There was some evidence that Fitz made his decision in April 2006. But Keiser testified that he spoke with Fitz two or three days after Nassar's resignation letter. According to Keiser, the letter shocked Fitz. Fitz felt that Levine should be publicly exonerated, so he resolved to stop Parkland from hiring Nassar. Whatever the terms of the affiliation agreement, Fitz's opposition prompted Parkland to withdraw the offer giving Nassar the July 10 start date. Nassar then accepted a position at a smaller HIV/AIDS clinic in Fresno, California.

In August 2008, Nassar filed suit in the Northern District of Texas claiming that UTSW had constructively discharged and retaliated against him, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The jury trial was bifurcated into a liability phase and a damages phase. At the close of Nassar's case in the liability phase, UTSW moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a), which the district court denied. The jury found that Nassar's resignation from UTSW was the result of constructive discharge, and that UTSW blocked Parkland from

No. 11-10338

hiring Nassar in retaliation for Nassar's statements in the July 3 letter. Nassar moved for front pay to be included as part of his recovery. The district court denied that motion and proceeded with the damages phase of the trial.

Nassar's resignation from UTSW took effect September 1, 2006, and he took up his new position at the clinic in Fresno. That clinic is run by Central California Faculty Medical Group ("CCMFG"), whose physicians are given faculty appointments at the University of California San Francisco. In the following years his salary at CCMFG has varied from $180,000 to $165,000. Nassar was making $155,095 per year (including benefits) as a UTSW Assistant Professor. If he had stayed on through the effective date of his promotion, he would have made $166,395 (including benefits). As a staff physician on Parkland's payroll, Nassar's compensation would have been approximately $240,500 per year (including benefits). The jury awarded Nassar $436,167.66 in back pay and over three million dollars in compensatory damages.

UTSW filed a renewed motion for judgment as a matter of law, a motion for new trial, and motion for remittitur.[1] The district court denied UTSW's motions for judgment as a matter of law and for a new trial. The district court did, however, grant UTSW's motion for remittitur because of Title VII's compensatory damages cap, which required reducing the compensatory damage award to $300,000.[2] Nassar moved for attorneys' fees pursuant to 42 U.S.C. § 2000e-5(k), and the district court granted awarded $489,927.50 in fees plus court costs. UTSW timely appealed, raising challenges to the sufficiency of the evidence, the jury instructions, the back pay and compensatory damages awards, and the award of attorneys' fees. Nassar timely filed a cross-appeal challenging the district court's denial of front pay.

---

[1] *See* FED. R. CIV. P. 50(b), 59(b), 59(e).

[2] *See* 42 U.S.C. § 1981a(b)(3)(D).

No. 11-10338

## II.  DISCUSSION

### A.    Sufficiency of the Evidence

We review de novo the denial of a motion for judgment as a matter of law, applying the same standard as the district court.  *Travelers Casualty & Surety Co. of America v. Ernst & Young LLP.*[3]  If the case has been tried to a jury,  a motion for judgment as a matter of law "is a challenge to the legal sufficiency of the evidence."[4]  "[A] jury verdict must be upheld unless there is no legally sufficient evidentiary basis for the jury to do what the jury did."[5]  In reviewing the sufficiency of the evidence, we "draw all reasonable inferences and resolve all credibility determinations in the light most favorable to the nonmoving party."[6]   "We reverse only if the evidence points so strongly and so overwhelmingly in favor of the moving party that no reasonable juror could return a contrary verdict."  *Porter v. Epps.*[7]

UTSW claims that there was insufficient evidence for the jury to have found for Nassar on either his constructive discharge claim or his retaliation claim.

### 1.    Constructive Discharge

To succeed on a constructive discharge claim, Nassar is required to show "'working conditions . . . so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'"  *Aryain v. Wal-Mart Stores Tex.*

---

[3] 542 F.3d 475, 481 (5th Cir. 2008).

[4] *Id.*

[5] *Id.* at 481-82(internal quotation marks and citation omitted).

[6] *Id.* at 482 (internal quotation marks and citation omitted).

[7] 659 F.3d 440, 445 (5th Cir. 2011) (internal quotation marks citation and brackets omitted).

*LP.*[8] Constructive discharge claims like the one Nassar brought are essentially hostile work environment claims but more extreme.[9] We therefore have required plaintiffs advancing constructive discharge claims to prove the existence of an aggravating factor. *Brown v. Kinney Shoe Corp.*[10] Such factors include:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibility; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.[11]

Nassar proved none of these factors with the possible exception of "badgering, harassment, and humiliation." In fact, UTSW approved Nassar's promotion to a position with a higher salary and more preferable employment terms. With respect to the harassment, when viewed in the light most favorable to the jury's verdict, Nassar proved that Levine racially harassed him, but his proof was no more than the "minimum required to prove a hostile work environment."[12] When considering the aggravating factors, it cannot be said that there was

---

[8] 534 F.3d 473, 480 (5th Cir. 2008) (quoting *Penn. State Police v. Suders*, 542 U.S. 129, 141, 124 S. Ct. 2342, 2342 (2004)).

[9] *Suders*, 542 U.S. at 146, 124 S. Ct. at 2354; *Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 444 (5th Cir. 2011) (A constructive discharge claim "requires a greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment." (internal quotation marks omitted)). In order to establish a hostile working environment claim, a plaintiff must prove (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002).

[10] 237 F.3d 556, 566 (5th Cir. 2001).

[11] *Dediol*, 655 F.3d at 444.

[12] *Id.* (internal quotation marks and citation omitted).

sufficient proof to show that Nassar's "working conditions were so intolerable that a reasonable employee would feel compelled to resign."[13]

### 2.    Retaliation

The required proof for a Title VII retaliation claim is less demanding than constructive discharge. "It goes without saying that, when a race-discrimination claim has been fully tried, as has this one, this court need not parse the evidence into discrete segments corresponding to a prima facie case, an articulation of a legitimate, nondiscriminatory reason for the employer's decision, and a showing of pretext." *DeCorte v. Jordan.*[14]   Our review is instead "to determine only whether the record contains sufficient evidence for a reasonable jury to have made its ultimate finding that [the employer's] stated reason for [taking adverse employment action against the employee] was pretext or that, while true, was only one reason for their being fired, and race was another motivating factor."[15]

Nassar's claim is that Fitz blocked his move to become a Parkland staff physician because he complained about harassment by Levine.  UTSW has argued here and at trial that Fitz thwarted Nassar's prospective employment at Parkland as a routine application of UTSW's rights under the UTSW-Parkland affiliation agreement.  Viewing the evidence in the light most favorable to the jury's verdict, Nassar offered sufficient proof that Fitz invoked UTSW's putative rights under the agreement in order to punish Nassar for his complaints about Levine.  Keiser testified that Fitz told him that Nassar's complaints in the resignation letter were his reason for blocking the Parkland position.  UTSW put

---

[13] *Brown*, 237 F.3d at 566 (internal quotation marks and citation omitted) (reversing a jury verdict on constructive discharge); *see also Brown v. Bunge Corp.*, 207 F.3d 776, 782–83 (5th Cir. 2000) (affirming summary judgment against constructive discharge claim where plaintiff was unfairly criticized, demoted, and given fewer job responsibilities).

[14] 497 F.3d 433, 437–38 (5th Cir. 2007) (internal quotation marks omitted).

[15] *Id*. at 438.

on testimony indicating that Fitz made his decision before the letter and that he regarded the matter as a routine application of the agreement. The jury considered both parties' evidence and resolved the conflict against UTSW. Since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," we find no basis to upset the jury's verdict that UTSW retaliated against Nassar because of his complaints of racial discrimination.[16]

## B.    Nassar's Monetary Recovery

UTSW challenges the award of back pay and compensatory damages, and Nassar challenges the denial of front pay. All of these decisions are reviewed for abuse of discretion.[17]    We have found the jury's verdict as to constructive discharge insufficiently supported, and the jury's damage award did not separate the damages awarded to Nassar for the retaliation claim and the damages awarded for the constructive discharge claim. We will therefore remand the case to the district court for recalculation of damages. *See Neill v. Diamond M. Drilling Co.*[18]    Nonetheless, the parties present legal issues relating to Nassar's monetary recovery that ought to be resolved now.

### 1.    Back Pay and Compensatory Damages

UTSW argues that back pay should have been determined by comparing Nassar's compensation at UTSW and his compensation at CCMFG, and not, as the district court allowed, by comparing his prospective compensation at Parkland and his compensation at CCFMG. "A back pay award, as all damages

---

[16] *Id.* at 437 (internal quotation marks and citation omitted). UTSW also urges error based on the jury having been instructed on a mixed-motive theory of retaliation. UTSW concedes that its argument is foreclosed by our decision in *Smith v. Xerox Corp.*, 602 F.3d 320, 330 (5th Cir. 2010). We therefore find no error in the jury instructions.

[17] *DeCorte*, 497 F.3d at 442 (compensatory damages); *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 489, 92 (5th Cir. 2001) (front pay and back pay).

[18] 426 F.2d 487, 491–92 (5th Cir. 1970).

No. 11-10338

awarded pursuant to Title VII, should make whole the injured party by placing that individual in the position he or she would have been in but for the discrimination." *Sellers v. Delgado Community College.*[19] By retaliating against Nassar and blocking his job with Parkland, UTSW deprived Nassar of the pay he otherwise would have earned there.  Therefore, to make Nassar whole, the back pay ought to be measured against what Nassar would have made at Parkland.  Title 42, United States Code, § 2000e-5(g) authorizes back pay awards.  Unlawful retaliation can take the form of a former employer preventing a plaintiff from getting a job with another employer.  *Robinson v. Shell Oil Co.*[20] Section 2000e-5(g) states that back pay is "payable by the employer . . . responsible for the unlawful employment practice."  It does not require that the employer liable for back pay be the same entity for whom the plaintiff would have worked had he not suffered unlawful retaliation.

Nassar testified that he has suffered a decrease in his income in honoraria he receives for attending conferences and other speaking engagements.  At his new post, his honoraria income is approximately one hundred thousand dollars less per year than when he had a UTSW affiliation.  Nassar claimed that he lost approximately one hundred thousand dollars per year in honoraria.  UTSW argues that it was error for the jury to have been able to consider honoraria as a part of its award of back pay.  We agree.  "Pay," used as a noun, means "something paid for a purpose and especially as a salary or wage."[21]  Although Nassar would not have been able to obtain these honoraria without his job at

---

[19] 839 F.2d 1132, 1136 (5th Cir. 1988).  The district court can decide the amount of back pay on its own, or empanel an advisory jury.  *Black v. Pan Am. Lab., L.L.C.*, 646 F.3d 254, 263 (5th Cir. 2011).  But either party can demand a jury trial on compensatory damages.  42 U.S.C. § 1981a(c)(1).

[20] 519 U.S. 337, 346, 117 S. Ct. 843, 849 (1997).

[21] MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 851 (10th ed. 1998).

UTSW, they were paid by third parties for services that were not required under the terms of his UTSW employment. Therefore, they are not akin to salary, wages, or benefits, the normal components of back pay.[22]

Compensatory damages available in a Title VII case cannot include back pay or front pay, 42 U.S.C. § 1981a(b)(2), but they do cover "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." *Id.* at § 1981a(b)(3). Nassar's lost honoraria income is thus awardable as compensatory damages to the extent the loss was caused by UTSW's blocking Nassar's position at Parkland rather than Nassar's decision to resign from UTSW. That factual question must be resolved on remand.

### 2.    Front Pay and Attorneys' Fees

We will not address the front pay issue because we must remand for reconsideration of Nassar's monetary compensation in light of our findings that there was insufficient evidence to support constructive discharge and that honoraria should not have been considered part of back pay. We believe that "it is prudent to remand the [attorneys'] fee award for reconsideration" as well. *Hitt v. Connell.*[23] We thus express no opinion on the district court's front pay decision or the fee award.

### III.  CONCLUSION

For the foregoing reasons, we VACATE the district court's judgment regarding UTSW's liability for constructive discharge, we AFFIRM the district court's judgment regarding liability for retaliation, and we REMAND the case for reconsideration, consistent with this opinion, of Nassar's monetary recovery and the award of attorneys' fees.

---

[22] *See* 5 LEX K. LARSEN, LARSON ON EMPLOYMENT DISCRIMINATION § 92.06[2] (2d ed. 2011).

[23] 301 F.3d 240, 251 (5th Cir. 2002).

No. 11-10338