RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0097p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

─────────────────

SHERYL L. SZEINBACH,

*Plaintiff-Appellant,*

*v.*

No. 15-3016

THE OHIO STATE UNIVERSITY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:08-cv-00822—Mark R. Abel, Magistrate Judge.

Decided and Filed: April 20, 2016

Before: MERRITT, BATCHELDER, and GILMAN, Circuit Judges.

─────────────────

**COUNSEL**

**ON BRIEF:** Eric Rosenberg, ROSENBERG & BALL CO. LPA., Granville, Ohio, for Appellant. Amy Nash Golian, Michael C. McPhillips, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

─────────────────

**OPINION**

─────────────────

RONALD LEE GILMAN, Circuit Judge. Dr. Sheryl Szeinbach sued The Ohio State University (OSU) for discrimination and retaliation under Title VII of the Civil Rights Act of 1964. After a three-week trial, the jury returned a verdict awarding her $513,368 in damages. The first $300,000 of the award represented compensatory damages for emotional suffering, harm to her professional reputation, and other losses; the remaining $213,368 represented back

1

pay to account for the higher income that Szeinbach allegedly would have earned in the absence of OSU's illegal conduct.

OSU moved for a remittitur of the award on the ground that it was excessive in relation to the evidence of damages that Szeinbach had put forward at trial. The district court denied the motion with respect to the compensatory damages but granted the motion with respect to the jury's award of back pay. Accordingly, the court reduced Szeinbach's damages by $213,368.

Szeinbach now appeals, arguing that she had adequately proved her entitlement to back pay. Because we conclude that the evidence she submitted on this issue was wholly speculative, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Szeinbach's hiring and allegations of discrimination

OSU hired Szeinbach in January 1999 as a full professor with tenure in the College of Pharmacy (COP). Szeinbach has remained in that position without interruption since her initial hiring. She is specifically employed as a professor within the COP's Division of Pharmacy Practice and Administration. Until recently, that division also included doctors Enrique Seoane-Vazquez (who is of Spanish origin) and Rajesh Balkrishnan (who is of Indian origin).

In 2005 and 2006, Szeinbach allegedly observed Balkrishnan and others in the COP discriminate against Seoane by, among other things, preparing an unfavorable employment evaluation. She also claims that, on several occasions, Balkrishnan discriminated in favor of Indian students.

Szeinbach raised her concerns about Balkrishnan in a 2005 email to the dean of the COP, stating that the evaluation of Seoane had been "intentionally very biased." In addition, Szeinbach allegedly continued to observe discriminatory conduct that left her convinced that "people were really trying to sabotage" Seoane's research. These concerns brought Szeinbach into conflict with Balkrishnan. The two argued and traded insults at staff meetings, and they each complained about the other to fellow members of the COP faculty.

During this time, Seoane filed both an internal complaint and an Equal Employment Opportunity Commission (EEOC) charge against OSU, contending that he had been the victim of discrimination. Szeinbach later alleged that she had supported Seoane's efforts by listening to his concerns and providing him with a copy of her earlier email to the COP dean. She also filed her own internal complaint against Balkrishnan and other specific members of the OSU faculty, alleging that they had retaliated against her for supporting Seoane.

The conflict between Szeinbach and Balkrishnan escalated in April 2007, when Balkrishnan sent a letter to the editor of the *Primary Care Respiratory Journal*. His letter claimed that an article that Szeinbach had published in the journal was nearly identical to an earlier article that Szeinbach had published in another journal in 2005, and that Szeinbach had failed to follow professional norms by neglecting to cite the earlier article. Balkrishnan then sent similar correspondence to the dean of the COP and to a group of professors at other universities.

The next month, Balkrishnan filed an internal complaint against Szeinbach on the basis of the same allegations. This resulted in the formation of a Committee of Initial Inquiry to review Balkrishnan's claims. The Committee concluded that Szeinbach's use of and failure to cite her earlier 2005 article demonstrated the "poorest of scholarly practices" and warranted further investigation. Subsequently, however, OSU changed its internal standards regarding the research-misconduct review process. Szeinbach's conduct did not warrant scrutiny under the new standards, which caused OSU to close its investigation.

In the meantime, Szeinbach published a correction in the *Primary Care Respiratory Journal* where she acknowledged that she was "remiss" in not citing her earlier article. The journal also included a note in which the journal's editors chastised Szeinbach and explained that her conduct did not conform to the standards of professionalism that the journal expected of its authors.

In August 2007, Balkrishnan sent an email link to the editors' note to the entire COP faculty, adding that the matter was one "of great shame and disrepute" to the COP. He also continued to argue with Szeinbach and, at a September 2007 faculty meeting, he lost his temper, shouted at Szeinbach, and called her a "bitch."

Szeinbach responded to these events by filing a charge of discrimination and retaliation with the EEOC. She subsequently received a right-to-sue letter and filed the current lawsuit.

**B.          Szeinbach's claims, the trial, and the jury award**

Szeinbach's complaint alleged that OSU discriminated and retaliated against her because of her support for Seoane. She specifically identified (1) the investigation into her publication history, and (2) Balkrishnan's outburst at the September 2007 faculty meeting as incidents of discriminatory and retaliatory conduct. In addition, she alleged that the emails that Balkrishnan sent to COP faculty members and to professors at other universities were part of a "Retaliation Plan" that was specifically designed to punish Szeinbach for her support of Seoane.

The case eventually proceeded to a jury trial in June 2014, at which time Szeinbach testified about the alleged effects of OSU's conduct. She contended that the dissemination of information about the investigation of her publication history violated the university's confidentiality policy and that this dissemination harmed her reputation in the scientific community.

Szeinbach also addressed her continued employment with OSU and her pursuit of other job opportunities. She said that, in 2006, she had briefly explored an alleged opening with the University of Arkansas, but acknowledged that she had received no offer of employment for the position. Later, she stated that she gave a seminar at the University of Kentucky in 2011, but that she had little to no contact with that university following her presentation. Finally, she stated that she had "not really looked for a job" after the investigation into her publication history because she preferred to get "this [controversy] taken care of according to Ohio State's own policy."

The jury also heard testimony from Szeinbach's expert witness, Dr. Stephen Schondelmeyer. He compared the salary that Szeinbach earned while working at OSU to the salaries paid to professors of pharmacy at other universities. To do so, he relied on statistics collected by the American Association of Colleges of Pharmacy. These statistics allowed him to calculate the median salary for pharmacy professors, taking into account factors such as the professors' status (tenured, visiting, etc.) and research productivity. He accordingly explained

that he was able to compare Szeinbach's salary at OSU to the salary of similarly situated professors at other major universities.  In the end, Schondelmeyer concluded that Szeinbach had been paid less at OSU than she would have been paid at one of these other institutions.  He calculated the salary differential over the relevant time period as $213,368.

During closing arguments, Szeinbach's attorney asked the jury to award two kinds of damages.  He first requested an award of $300,000, representing the maximum compensatory damages allowed under 42 U.S.C. § 1981a(b)(3).  Second, he requested a back-pay award in an amount sufficient to compensate Szeinbach for the alleged salary differential between OSU and other comparable universities.  He argued that this latter award was appropriate because the reputational harm associated with OSU's conduct had prevented Szeinbach from obtaining a position with a higher-paying employer.  In support of this claim, counsel cited Schondelmeyer's testimony and urged the jury to award approximately $213,000 as "the number that [Szeinbach] has lost since 2007 because she can't go to a job somewhere else."

Ultimately, the jury returned a verdict in favor of Szeinbach on the ground that OSU was responsible for Balkrishnan's discriminatory and retaliatory actions.  The jury awarded Szeinbach a total of $513,368 in damages.

## C.     Post-trial proceedings

In July 2014, OSU moved for a new trial or, in the alternative, for a remittitur.  The district court denied the motion for a new trial, *see Szeinbach v. Ohio State Univ.*, No. 2:08-CV-822, 2014 WL 7741404, at *24 (S.D. Ohio Dec. 12, 2014), and that decision is not part of the present appeal.  With regard to the motion for a remittitur, however, the court reduced the jury award down to the $300,000 cap set forth in 42 U.S.C. § 1981a(b)(3).  *Id.* at *25-27.

In opposing this reduction, Szeinbach argued that the $213,368 excess was exempt from the § 1981a(b)(3) cap because the excess constituted an award "for lost back pay opportunities." *Id.* at *25.  The district court rejected this argument on two grounds.  First, it concluded that Szeinbach had not presented an adequate factual basis for the excess.  It noted that Szeinbach relied on Schondelmeyer's testimony to support her arguments, but the court then concluded that Schondelmeyer's research methodology failed to account for key differences between

Szeinbach's employment at OSU and the employment of professors elsewhere. The court thus determined that his testimony was "flawed and [could not] be used to support [the] conclusion that [Szeinbach's] salary would have been higher at another university." *Id.* at *26.

Second, the district court concluded that an award of back pay could not be based on an amount that an employer other than the discriminating defendant itself would have paid. Relying on *Kaiser v. Buckeye Youth Center*, 812 F. Supp. 118 (S.D. Ohio 1993), the court stated that back pay "consists of lost money and benefits from the employer who discriminated against the plaintiff." *Szeinbach*, 2014 WL 7741404, at *26; *see also Kaiser*, 812 F. Supp. at 119 ("The plain language of the statute restricts the term 'back pay' to the compensation for performing work for the employer who discriminated against the worker . . . ."). The court thus concluded that Szeinbach could not establish a claim to back pay by proffering evidence of what employers other than OSU allegedly would have paid in the absence of OSU's illegal actions. *See Szeinbach*, 2014 WL 7741404, at *26 ("Plaintiff does not cite to any case law for the proposition that back pay is pay that would have been earned from employment other than with the employer who engaged in discriminatory conduct.").

Szeinbach now appeals. She maintains that the district court erred when it adopted a definition of back pay that excluded any consideration of what employers other than OSU would have paid her. In addition, she maintains that Schondelmeyer's testimony regarding the salaries at universities other than OSU was sufficient to sustain the jury's award of back pay.

## II. ANALYSIS

### A.     Standard of review

A district court should not grant a motion for a remittitur unless a jury's award "is: 1) beyond the range supported by proof; 2) so excessive as to shock the conscience; or 3) the result of mistake." *Denhof v. City of Grand Rapids*, 494 F.3d 534, 547 (6th Cir. 2007). We will not reverse the district court's application of this standard unless the district court abused its discretion. *Id.* Reversal is therefore appropriate only when we have "a definite and firm conviction" that the district court made a clear error of judgment. *Mich. First Credit Union v. Cumis Ins. Soc'y, Inc.*, 641 F.3d 240, 245 (6th Cir. 2011).

**B.       Remedies available under Title VII**

42 U.S.C. § 1981a(b)(3) imposes a cap on the amount of compensatory damages available in a cause of action under Title VII.  For an employer such as OSU with more than 500 employees, the statute provides that "[t]he sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses . . . shall not exceed . . . $300,000."  42 U.S.C. § 1981a(b)(3)(D).

But this cap does not apply to the remedies of front pay and back pay.  These remedies are considered "equitable" rather than "compensatory," and are therefore not within the scope of § 1981a(b)(3).  *See Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846, 852-53 & n.3 (2001) (addressing front pay); *Reeb v. Ohio Dep't of Rehab. & Corr.*, 435 F.3d 639, 650 (6th Cir. 2006) (addressing back pay).

Front pay is "money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement."  *Pollard*, 532 U.S. at 846.  In the present case, Szeinbach never lost her position as a professor in the COP.  There is accordingly no need for reinstatement or payment in lieu of reinstatement, so the parties agree that front pay is not an issue in the current appeal.

Back pay, in contrast, is money awarded for lost compensation during the period between the date of the plaintiff's injury (i.e., the date on which the discriminatory course of conduct began) and the date on which damages are determined.  *Howe v. City of Akron*, 801 F.3d 718, 745 (6th Cir. 2015) (discussing the methodology for computing a back-pay award).  The appropriate amount of back pay is calculated by comparing (1) the amount the plaintiff actually earned while being subjected to the employer's discrimination, and (2) the amount that the plaintiff would have earned in the absence of any discrimination.  *See id.* at 746 ("Once the district court has selected starting and ending dates for the back-pay award period, the court must calculate the wages each plaintiff would have earned had he or she been promoted, before subtracting the wages he or she actually earned without the promotion.").  Stated differently, the measure of back pay is the difference between the amount that the plaintiff actually earned while

being discriminated against and the amount that the plaintiff would have earned if no discrimination had occurred.

The purpose of back pay "is to make whole the victim of an unlawful employment practice by restoring the employee to the position he or she would have been in absent the discrimination." *Howe*, 801 F.3d at 744 (alterations, citations, and internal quotation marks omitted). In light of this purpose, back pay is a comprehensive remedy. It should "completely redress the economic injury the plaintiff has suffered" by encompassing the salary and any raises that the plaintiff would have received, "as well as sick leave, vacation pay, pension benefits and other fringe benefits she would have received but for discrimination." *Id.* (quoting *Gutzwiller v. Fenik*, 860 F.2d 1317, 1333 (6th Cir. 1988)).

An award of back pay in Title VII cases is presumptively favored. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 420 n.12 (1975). Hence, "given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Howe*, 801 F.3d at 744 (quoting *Albemarle*, 422 U.S. at 421); *see also Rasimas v. Mich. Dep't of Mental Health*, 714 F.2d 614, 626 (6th Cir. 1983) ("[I]n the absence of exceptional circumstances, backpay should always be awarded when a Title VII violation is found."). Neither the employer's "arguable good faith" nor "difficulty in calculating the backpay award" constitutes a sufficient basis for withholding back pay. *Rasimas*, 714 F.2d at 626.

Nevertheless, back pay is not appropriate in all situations. The plaintiff in a Title VII case must prove her entitlement to back pay and establish the appropriate amount with reasonable certainty. *McMahon v. Libbey-Owens-Ford Co.*, 870 F.2d 1073, 1079 (6th Cir. 1989) ("[B]ack pay must be limited to actual damages and proved with reasonable certainty." (citation and internal quotation marks omitted)). If the plaintiff fails to offer such proof, then an award of back pay is not warranted. *See id.*; *see also Christopher v. Stouder Mem'l Hosp.*, 936 F.2d 870, 880 (6th Cir. 1991) (affirming the district court's denial of back pay when the plaintiff "did not prove what she actually would have received" and the claim to back pay was based on "mere speculation").

The appropriate amount of back pay is the sole issue on appeal in the present case. Szeinbach contends that the jury correctly determined that she was entitled to $213,368 in back pay. This amount, according to Szeinbach, represents the disparity between (1) the amount that that she actually earned while working for OSU, and (2) the amount that she would have earned had OSU's discriminatory conduct not prevented her from taking a position at a different university.

OSU responds that the $213,368 cannot properly be characterized as back pay. It first maintains that Szeinbach was ineligible for back pay because she never lost her job or suffered a decrease in salary while working at OSU, and because comparing what Szeinbach might have earned while working for a different employer is not an appropriate basis for calculating her alleged damages. OSU also contends in the alternative that the evidence supporting her entitlement was too speculative to warrant the award of $213,368.

**C.　　The district court erred by restricting the measure of back pay to what Szeinbach could have earned while working only for OSU**

As noted above, the district court granted OSU's motion for a remittitur in part on the basis that an award of back pay cannot be based on the difference between what a prevailing plaintiff earned while working for her culpable employer and what the plaintiff would have earned in the absence of discrimination while working elsewhere. The court instead interpreted Title VII as allowing for back pay only on the basis of a comparison between what the plaintiff actually earned and what she could have earned while working for the same employer. *See Szeinbach v. Ohio State Univ.*, No. 2:08-CV-822, 2014 WL 7741404, at *26 (S.D. Ohio Dec. 12, 2014). Szeinbach disputes this analysis.

The district court based its ruling on *Kaiser v. Buckeye Youth Center*, 812 F. Supp. 118 (S.D. Ohio 1993). In that case, the plaintiff originally held two jobs: a day job with a county government and a night job with the Buckeye Youth Center. He alleged that Buckeye discriminated against him by transferring him to its day shift, thus requiring him to resign from his daytime position with the county government. The plaintiff sought damages to account for the income that he would have earned had he not been forced to give up his position with the county.

The district court in *Kaiser* rejected the plaintiff's entitlement to such compensation. In doing so, the court focused on 42 U.S.C. § 2000e–5(g), which provides that a court in a Title VII cause of action

> may enjoin the respondent from engaging in [an] unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate.

The *Kaiser* court concluded that the "plain language" of the above statute "restricts the term 'back pay' to the compensation for performing work for the employer who discriminated against the worker." 812 F. Supp. at 119. It accordingly determined that the plaintiff could not obtain back pay based on work that he would have performed for the county government; instead, the measure of back pay could be based only on what the defendant Buckeye would have paid the plaintiff. *See id.*

The district court in the present case decided to follow *Kaiser, see Szeinbach*, 2014 WL 7741404, at \*26, but following *Kaiser* raises multiple problems. First, the district court erroneously referred to *Kaiser* as a decision from this court. *Id.* ("[Plaintiff's cited caselaw] is at odds with the Sixth Circuit's ruling in *Kaiser*."). The district court thus stated that it was required to follow *Kaiser* when in reality *Kaiser* represents nothing more than potentially persuasive authority from one of the district court's sister tribunals.

Second, the "plain language" of 42 U.S.C. § 2000e–5(g) does not support the *Kaiser* court's interpretation of the statute. The statute provides that an award of back pay shall be "payable by the employer . . . responsible for the unlawful employment practice," but says nothing about how to calculate the amount that the responsible employer must pay. Hence, even though the culpable employer itself must indeed pay the appropriate amount of back pay, nothing in the statute forecloses the possibility that the amount might depend on what the plaintiff could have earned while working for a different employer.

Finally, the *Kaiser* court offered no supporting caselaw for its analysis. It baldly stated that "[t]he courts have so interpreted § 2000e–5(g)," but omitted any supporting citations for that

assertion. *See* 812 F. Supp. at 119. In fact, at least one circuit court has subsequently reached the opposite conclusion. *See Nassar v. Univ. of Texas Sw. Med. Ctr.*, 674 F.3d 448 (5th Cir. 2012), *vacated on other grounds*, 133 S. Ct. 2517 (2013). The plaintiff in *Nassar* was originally employed with the University of Texas Southwestern Medical Center (UTSW). He experienced harassment at the hands of a UTSW employee, so he sought a new position with a different employer—Parkland Hospital. Parkland extended Nassar a formal offer of employment but, before Nassar began working there, another UTSW employee "resolved to stop Parkland from hiring [him.]" *Id.* at 451. That employee successfully "prompted Parkland to withdraw the offer" to Nassar, leading Nassar to eventually take a position with a third employer at a lower salary. *Id.*

In pursuing his subsequent Title VII claim, Nassar sought back pay based on the difference between (1) the amount that he was earning with the third employer, and (2) the amount that he would have earned with Parkland. *Id.* at 454-55. UTSW opposed this measure of back pay, asserting that the appropriate comparison was between the amount earned with the third employer and the amount that Nassar would have earned had he continued working at UTSW. *Id.*

The Fifth Circuit rejected UTSW's argument. Unlike the district court in *Kaiser*, the Fifth Circuit interpreted 42 U.S.C. § 2000e–5(g) by drawing a distinction between the entity that is liable for an award of back pay and the way in which the amount of that award is calculated. *Id.* at 455. The court observed that, even though 42 U.S.C. § 2000e–5(g) provides that back pay is "payable by the employer . . . responsible for the unlawful employment practice," the statute "does not require that the employer liable for back pay be the same entity for whom the plaintiff would have worked had he not suffered unlawful retaliation." *Id.* As a result, the court held that the amount of Nassar's back pay could appropriately be based on a comparison between what he was earning with the third employer and what he would have earned had UTSW not improperly interfered with his job offer from Parkland. *Id.*

The same reasoning applies in the present case. Assuming for the sake of argument that Szeinbach did have a firm offer of employment from a university other than OSU, and assuming that OSU's allegedly illegal conduct resulted in the withdrawal of that offer, then the appropriate

measure of back pay would be the difference between (1) what Szeinbach actually earned at OSU, and (2) what Szeinbach would have earned while working for the other university.

This interpretation of the back-pay remedy is consistent with the remedy's purpose. The goal of back pay, as noted above, is to place the plaintiff in the position that she would have occupied in the absence of any illegal conduct by her employer. *See Howe v. City of Akron*, 801 F.3d 718, 744 (6th Cir. 2015). Hence, if the plaintiff can in fact show that, but for the defendant's discriminatory conduct, she would have obtained a higher-paying position with a third-party employer, then the purpose of Title VII is furthered by the court's recognizing this differential by awarding back pay commensurate with the higher-paying position.

This holds true regardless of whether the higher-paying position is associated with the discriminating employer or with a third party. The goal, after all, is to make the plaintiff just as well off as she would have been in a nondiscriminatory employment situation. Imposing arbitrary restraints on this process (such as by limiting the available employment opportunities solely to those offered by the culpable employer) would frustrate this goal and prevent the courts from truly making the plaintiff "whole." *See Nassar*, 674 F.3d at 455 ("By retaliating against Nassar and blocking his job with Parkland, UTSW deprived Nassar of the pay he otherwise would have earned there. Therefore, to make Nassar whole, the back pay ought to be measured against what Nassar would have made at Parkland.").

For these reasons, we conclude that the district court erred in determining that any amount of back pay had to be based on a comparison between what Szeinbach actually earned while being subjected to OSU's discrimination and what she would have earned at OSU in the absence of discrimination. Instead, the district court should have considered the possibility that employment opportunities with third-party employers might have affected the proper calculation of back pay.

**D.     Szeinbach failed to establish her entitlement to back pay with reasonable certainty**

The above analysis, however, does not mandate that this appeal be decided in Szeinbach's favor. Even though we conclude that Szeinbach could appropriately seek an award

of back pay based on what she would have earned with a third-party employer, Szeinbach must *prove* her entitlement to such back pay.  Unfortunately for Szeinbach, she failed to do so.

To prevail on a claim for back pay under Title VII, a plaintiff must establish the amount of back pay with reasonable certainty.  *McMahon v. Libbey-Owens-Ford Co.*, 870 F.2d 1073, 1079 (6th Cir. 1989) ("[B]ack pay must be limited to actual damages and proved with reasonable certainty." (citation and internal quotation marks omitted)).  The plaintiff cannot rest her entitlement to back pay on "mere speculation" about what she would have earned in the absence of discrimination.  *Hance v. Norfolk S. Ry. Co.*, 571 F.3d 511, 520 (6th Cir. 2009) ("Although back pay in a Title VII case need not be proven with the exactitude of lost profits in a breach of contract case, neither can such an award be appropriately founded on mere speculation." (citation and internal quotation marks omitted)).

In the present case, Szeinbach built her claim to back pay on (1) her own testimony about positions at universities other than OSU, and (2) her expert witness's testimony about salaries at those other universities.  The testimony provided, however, failed to establish a reasonably certain basis for calculating an award of back pay.

### 1. *Szeinbach's testimony*

We first consider Szeinbach's own testimony.  Szeinbach said that she considered pursuing jobs at the University of Arkansas in 2006 and at the University of Kentucky in 2011, but that the reputational harm from OSU's discrimination prevented her from obtaining a position at either institution.

With regard to the Arkansas position, Szeinbach testified that she spoke to a representative of the university in May 2006.  She was invited to visit the university if she was ever in the area, but she did not follow up on the invitation, and she did not speak to the representative again for approximately one year.  In addition, she acknowledged that (1) she never interviewed for a position at Arkansas, (2) she did not receive an offer of employment from Arkansas, and (3) she did not know whether or when Arkansas filled the allegedly open position.  OSU's attorney then asked Szeinbach on cross-examination whether she had "lost out"

on a position at Arkansas. Szeinbach responded: "I didn't say I lost out on it. I just said I stopped pursuing it."

With respect to the University of Kentucky, Szeinbach testified that she gave a seminar at the university in 2011. She regarded such seminars as potential precursors to recruitment efforts but, after giving the seminar at Kentucky, Szeinbach never heard anything further from the university. In addition, she acknowledged that she did not contact anyone from the university to inquire further about a potential position, and she later conceded that she had not looked for any other positions because she was "happy" with her current employment.

The above-described testimony does not establish with "reasonable certainty" that, in the absence of OSU's discrimination, Szeinbach would have obtained a position with a university other than OSU. To the contrary, Szeinbach at most was involved in preliminary recruitment efforts that carried no reasonable certainty of future employment. Moreover, Szeinbach's testimony indicates that—rather than being prevented from obtaining an alternative position by OSU's conduct—Szeinbach herself decided to voluntarily cease seeking other positions. Szeinbach's testimony about other employment opportunities that she might have received thus constitutes the sort of "mere speculation" that is an insufficient foundation for an award of back pay. *See Hance*, 571 F.3d at 520.

Szeinbach counters this conclusion by citing this court's decision in *Oakley v. City of Memphis*, 566 F. App'x 425 (6th Cir. 2014), for the proposition that back pay is customarily calculated by looking at jobs that a plaintiff allegedly failed to obtain because of the employer's illegal conduct. But Szeinbach misreads *Oakley*. This court's decision in *Oakley* concerned the effect of "interim earnings" on back-pay calculations. *See id.* at 429. As explained in that case, "interim earnings" are defined to include "earnings from jobs that could not have been worked had no discrimination occurred." *Id.* (internal citation and quotation marks omitted). These earnings, in other words, represent compensation that a plaintiff would not have received in the absence of the complained-of discrimination. Hence, in calculating the proper amount of back pay to remedy the discrimination, "courts are required to deduct interim earnings." *Id.* Otherwise, the plaintiff would receive an improper windfall by recovering both (1) the amount of

money that she would have earned in the absence of discrimination, and (2) the amount of interim earnings that she received while being subjected to discrimination.

This discussion from *Oakley* has no applicability to Szeinbach's situation because *Oakley* does not stand for the broad proposition asserted by Szeinbach. Instead, the case simply addresses an interim-earnings issue that neither party has argued is relevant to this appeal.

Moreover, the facts of *Oakley* support the conclusion that Szeinbach failed to adequately prove her entitlement to damages. The plaintiffs in *Oakley* were police officers who asserted that, as part of their remedy for the defendant's discrimination, they were entitled to promotions within the police department. In rejecting this argument, the district court observed that the police chief had "largely unfettered discretion" over promotions, meaning "there [was] simply no guarantee that the Chief . . . would have promoted any particular individual." *Id.* at 431. The plaintiffs' requests for promotions were accordingly too speculative for them to be granted. *See id.* ("The district court denied such damages, finding that this argument was based on underlying assumptions that were too remote and speculative to merit judicial relief.").

So too in Szeinbach's case. The University of Arkansas and the University of Kentucky have discretion in their hiring decisions, and nothing in the record indicates that Szeinbach had any legitimate basis to believe that she would likely be employed by either of them. That Szeinbach might have earned any compensation outside of OSU is thus too speculative to support a calculation of back pay. *See id.*

Szeinbach also attempts to support her claim by citing *Nassar v. University of Texas Southwestern Medical Center*, 674 F.3d 448 (5th Cir. 2012), *vacated on other grounds*, 133 S. Ct. 2517 (2013). Her argument is unavailing, however, because *Nassar* is distinguishable on its facts. The third-party employer in that case had given the plaintiff a formal offer of employment with a fixed start date and a defined salary. *Id.* at 451. This allowed the factfinder in *Nassar* to readily conclude that, but for his current employer's discriminatory conduct, Nassar would indeed have begun working with the third-party employer.

Szeinbach failed to make a similar showing. She never had an interview for a position with the University of Arkansas, she never heard back from the University of Kentucky after

giving her seminar there, and she never received an offer of employment from either institution. Szeinbach also said that she was happy with her current employment. Her situation is thus too far removed from the circumstances in *Nassar* for the facts of that case to support Szeinbach's claim that she is entitled to back pay.

### 2. Dr. Schondelmeyer's testimony

We next turn to the testimony of Szeinbach's expert witness, Dr. Schondelmeyer. This witness testified that most major universities pay their pharmacy professors higher salaries than does OSU. He thus concluded that, if Szeinbach had successfully obtained a position at one of these other universities, she would have earned approximately $213,000 more than she actually earned at OSU over the relevant time period.

The district court concluded that Dr. Schondelmeyer's testimony did not support the jury's award of damages because Schondelmeyer's calculations suffered from methodological flaws. *See Szeinbach v. Ohio State Univ.*, No. 2:08-CV-822, 2014 WL 7741404, at *25-26 (S.D. Ohio Dec. 12, 2014). Although we agree with the district court's analysis, the issue whether Schondelmeyer's methodology is reliable enough to support a back-pay calculation is ultimately immaterial because Szeinbach's own testimony, as described above, failed to establish with reasonable certainty that, in the absence of OSU's discrimination, she would have obtained a position with a university other than OSU. Her claim to back pay, in short, is based on conjecture and speculation about her future job opportunities that are legally insufficient to justify her requested relief. *See, e.g., Oakley v. City of Memphis*, 566 F. App'x 425, 431 (6th Cir. 2014) (rejecting the plaintiffs' request for damages because they were "based on underlying assumptions that were too remote and speculative to merit judicial relief").

For these reasons, neither Szeinbach's own testimony nor the testimony of her expert witness established a sufficiently reliable basis for her entitlement to back pay. We thus conclude that the award of back pay did in fact go "beyond the range supported by [Szeinbach's] proof." *See Denhof v. City of Grand Rapids*, 494 F.3d 534, 547 (6th Cir. 2007). The district court therefore did not abuse its discretion in granting OSU's motion for a remittitur on the ground that Szeinbach had not presented an adequate factual basis for her proposed remedy.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.