United States Court of Appeals
Fifth Circuit

**F I L E D**

August 15, 2007

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

No. 05-31042

JUDITH L. DECORTE; ET AL.,

Plaintiffs,

JUDITH L. DECORTE; IRA C. AUSTIN, JR.; CYNTHIA C. BAGGETT; MERCEDES R. BITTINGER; TERRI C. BONNECARRE; ET AL.,

Plaintiffs-Appellees,

versus

EDDIE JORDAN; ET AL.,

Defendants,

EDDIE JORDAN, In his individual and official capacities; ORLEANS PARISH DISTRICT ATTORNEY'S OFFICE,

Defendants-Appellants.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before GARWOOD, BARKSDALE, and GARZA, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Eddie Jordan, District Attorney for Orleans Parish, Louisiana, appeals the jury verdict and damages awarded against him, in his official capacity, for intentional discrimination on the basis of race against non-attorney staff in his office, in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.*;

42 U.S.C. § 1981; and LA. REV. STAT. ANN. § 23:301 (Louisiana Employment Discrimination Law). Primarily at issue is whether sufficient evidence supports the verdict and compensatory damages. (Plaintiffs seek attorney's fees for this appeal.) **AFFIRMED and REMANDED for determination of attorney's fees**.

I.

In November 2002, Jordan was elected District Attorney (DA) for Orleans Parish, which primarily consists of New Orleans, Louisiana. Shortly thereafter, he appointed a transition team, which compiled a report of its recommendations for Jordan in his new position. The report included a cultural-diversity report recommending, within 100 days of his taking office, Jordan's hiring a staff reflective of New Orleans' racial composition. This recommendation was based on a Jordan campaign promise.

The transition team also formed a non-attorney staff development and retention committee, with Stephanie Butler serving as chairperson. In early December 2002, before Jordan took office, the non-attorney staff in the DA's office were instructed that, if they wanted to continue working there during Jordan's tenure, to schedule an interview and submit a current resume. Plaintiffs did so.

Butler, other members of her committee, and volunteers she selected, all of whom are black, conducted the interviews. Materials prepared for the process reflected interviewees were to

2

be told "[t]he interviewers want[ed] to review [their] background, hear about [their] qualifications and skills, and anything else [they]'d like to tell [them], and to basically get a feel for [them] and [their] work ethic". The interviewees were evaluated through a numeric system based on their responses to the same seven questions.

Butler's recommendations, however, were *not* based on the interview evaluations. They resulted in the termination of Plaintiffs, all of whom are white, except one who is Hispanic. In response, Plaintiffs filed charges with the Equal Employment Opportunity Commission (EEOC), claiming Jordan fired them, *inter alia*, because of their race. In responding to the EEOC, Jordan asserted Butler's committee had not considered race, but had "considered, among other things, performance, employee efficiency, and previous experience in its determination of which employees would be retained". After investigating the claims, the EEOC found there was reasonable cause to believe Jordan, through his termination decisions, had discriminated against Plaintiffs because of their race. As a result of the EEOC's issuing a right-to-sue letter, Plaintiffs pursued their race-discrimination claims in district court.

At trial in 2005, the jury returned a verdict for Plaintiffs, finding: Jordan, in his official capacity, had discriminated against Plaintiffs on the basis of race, in violation of Title VII,

3

42 U.S.C. § 1981, and the Louisiana Employment Discrimination Law; and Jordan would have terminated eight Plaintiffs even if race had not been a motivating factor. The judgment included monetary damages, including compensatory damages, for those 35 Plaintiffs terminated solely because of race. *DeCorte v. Jordan*, No. 03-1239 (E.D. La. 30 Sept. 2005) (amended judgment); *see also* *DeCorte v. Jordan*, No. Civ.A. 03-1239, 2005 WL 1576309 (E.D. La. 26 May 2005).

## II.

At issue are whether: sufficient evidence supports the verdict; the district court erred in both admitting EEOC determinations and ruling a cultural-diversity report constituted an affirmative-action plan; admission of compensatory-damages testimony is reversible error and sufficient evidence supports those damages; statements in Plaintiffs' closing argument are reversible error; and Plaintiffs should be awarded appellate attorney's fees.

## A.

Jordan first contends Plaintiffs failed to prove, by a preponderance of the evidence, a violation of Title VII, 42 U.S.C. § 1981, or the Louisiana Employment Discrimination Law. Claims of racial discrimination in employment, pursuant to 42 U.S.C. § 1981 and the Louisiana Employment Discrimination Law, are governed by the same analysis as that employed for such claims under Title VII. *Anderson v. Douglas & Lomason Co., Inc.*, 26 F.3d 1277, 1284 n.7

4

(5th Cir. 1994) (§ 1981); *Motton v. Lockheed Martin Corp.*, 900 So.2d 901, 909 (La. Ct. App.), *writ denied*, 904 So.2d 704 (2005) (Louisiana law).

Accordingly, Plaintiffs were required to establish, by a preponderance of the evidence, a *prima facie* case of racial discrimination by showing: (1) they were members of a protected group; (2) they were qualified for the positions they held; (3) they suffered an adverse employment action, such as termination; and (4) they were replaced by individuals outside the protected class. *See Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 881 (5th Cir. 2003). Upon doing so, the burden shifted to Jordan to rebut Plaintiffs' *prima facie* case by articulating a legitimate, nondiscriminatory reason for his actions. *Id.* If Jordan met this burden, it shifted to Plaintiffs to show his proffered reason is a pretext for discrimination. *Id.*

On appeal, a verdict must be upheld unless, pursuant to *de novo* review, "a reasonable jury would not have a legally sufficient evidentiary basis to find" as it did. FED. R. CIV. P. 50(a)(1). The reviewing court draws all reasonable inferences in favor of the nonmovant, "disregard[ing] all evidence favorable to the moving party that the jury is not required to believe". *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions,

5

not those of a judge'". *Id.* at 150 (quoting ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 255 (1986)).

It goes without saying that, when a race-discrimination claim has been fully tried, as has this one, this court "'need not parse the evidence into discrete segments corresponding to a prima facie case, an articulation of a legitimate, nondiscriminatory reason for the employer's decision, and a showing of pretext'". ***Bryant v. Compass Group USA Inc.***, 413 F.3d 471, 476 (5th Cir. 2005) (quoting ***Vaughn v. Sabine County***, 104 F. App'x. 980, 982 (5th Cir. 2004)), *cert. denied*, 126 S. Ct. 1027 (2006). Rather, review is to determine only whether the record contains sufficient evidence for a reasonable jury to have made its ultimate finding that Jordan's stated reason for terminating Plaintiffs was pretext or that, while true, was only one reason for their being fired, and race was another motivating factor. *See* ***id.***

### 1.

As a threshold matter, Plaintiffs contend Jordan waived the right to contest the sufficiency of the evidence because his Rule 50 motion at trial was insufficiently specific. Rule 50(a)(2) requires a movant for judgment as a matter of law (JMOL) to "specify the judgment sought and the law and facts that entitle [him] to the judgment". Jordan's bare-bones Rule 50(a) motion falls far short of that. Instead, after Plaintiffs presented their case, he moved to dismiss all the Plaintiffs, stating: "[A]ll they

6

have as far as evidence of discrimination are the numbers based upon what they saw in the ... room when they received their papers and their subjective active belief that it was discrimination that motivated those decisions". The court characterized this as a motion to dismiss "all claims based on insufficient evidence ... to show a *prima facie* case of racial discrimination". In responding, Plaintiffs did not challenge Jordan's lack of specificity under Rule 50(a). Before the case was submitted to the jury, Jordan "reurg[ed]" what the court described as his "Rule 50 motion", without adding any supporting facts or legal contentions.

Post-trial, Jordan submitted a renewed JMOL motion, pursuant to Rule 50(b), which was fully articulated. Moreover, Plaintiffs' opposition did *not* claim Jordan was raising issues for the first time. *See* **Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.**, 126 S. Ct. 980, 984 n.1 (2006) ("'A post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion.'" (quoting Amendments to Federal Rules of Civil Procedure, 134 F.R.D. 525, 687 (1991))). As a result of this "fail[ure] to raise th[e] forfeiture claim in opposition to the Rule 50(b) motion ... [Plaintiffs are] preclude[d from] raising [it] on appeal". **Arsement v. Spinnaker Exploration Co., LLC**, 400 F.3d 238, 247 (5th Cir. 2005). We caution that Rule 50(a) motions should be far more specific, as required by Rule 50(a)(2).

2.

7

Jordan's sufficiency-of-the-evidence challenge fails. Sufficient evidence was produced upon which a reasonable jury could have found discrimination.

All of the Plaintiffs are white, except one who is Hispanic but who was described as white in exhibits. Jordan does not dispute Plaintiffs were qualified for the positions from which they were terminated. The evidence showed that, within the first 72 days Jordan was in office, the racial composition of the DA's non-attorney staff changed from 77 whites and 56 blacks to 27 whites and 130 blacks. Fifty-three of those terminated were white; one was Hispanic; and two were black. Jordan does not dispute Plaintiffs were replaced by blacks, except an investigator, whom he claims was replaced by one of the white investigators he hired. The evidence shows, however, that after terminating that investigator, one of the 20 investigators fired (all white), Jordan retained five black investigators and hired ten blacks into investigator positions.

Attempting to show a legitimate, nondiscriminatory reason for the terminations, Jordan presented evidence that his hiring goal was to staff his office with persons, regardless of their race, he knew supported him, felt strongly in favor of him, and were eager to work for him. He emphasized his attempt to recruit a number of white attorneys; his promotion of several incumbent whites to high-level positions; and his decision to retain all of the former DA's attorney staff, which was majority white. Furthermore, Butler and

8

Jordan testified the interview evaluations were not used when making hiring decisions because the interviewers had not received descriptions of the positions until after the interviews had been completed. Instead, hiring decisions of *new employees* were based on financial considerations, minimum qualifications, recommendations from Jordan, shared philosophy, and work on Jordan's campaign and transition into office, while the retention and termination of *incumbent employees* were random. Jordan claims this use of a patronage system in making staffing decisions is permissible under **Rutan v. Republican Party of Illinois**, 497 U.S. 62 (1990). Despite these claims, for the 127 hiring recommendations, Butler was able to identify only approximately 32 that were made for political reasons.

"[A] reasonable juror certainly may infer discrimination when an employer offers inconsistent explanations for the challenged employment action", as occurred at trial. **Nichols v. Lewis Grocer**, 138 F.3d 563, 568 (5th Cir. 1998). As for Butler's methodology, Jordan stated in his response letters of position to the EEOC, admitted into evidence, that Butler's committee considered, *inter alia*, performance, employee efficiency, and previous experience, in making recommendations for incumbent employees' retention. Butler testified, however, that she did *not* consider these factors in making her employment recommendations. She explained that most of

her recommendations regarding incumbent employees were "just random".

Butler also testified, and Jordan asserts on appeal, that financial considerations drove her recommendations; and, because whites tended to be in higher-paid positions, they were more likely to be terminated. Jordan testified at trial, however, that his office was "not necessarily concerned in reducing the total amount of money for nonlegal employees", and did not cite such financial reasons in his letter to the EEOC. Furthermore, Butler testified that her recommendations did not result in a budget for non-attorney personnel that was much, if at all, lower than that of the previous DA.

Additionally, Plaintiffs presented statistical data from which the jury could have further based its finding that race was a motivating factor in Jordan's staffing decisions. *See* ***Plemer v. Parsons-Gilbane***, 713 F.2d 1127, 1137 (5th Cir. 1983) ("An employee may use statistics to show that an employer's justification for a discriminatory act is pretext."); *see also* ***Walther v. Lone Star Gas Co.***, 977 F.2d 161, 162 (5th Cir. 1992) (per curiam) ("We have recognized that gross statistical disparities ... may be probative of discriminatory intent, motive or purpose."). Plaintiffs' statistics showed that, as noted, on the date Jordan took office, the racial composition of the non-attorney staff was 77 whites, 56

blacks, two Hispanics, and one Asian; but, 72 days later, that composition had changed to 27 whites and 130 blacks.

Of the 56 non-attorney employees Jordan terminated, 53 were white, one was Hispanic, and two were black. Plaintiffs' statistician testified that, according to his analyses: the probability that 53 out of 56 terminated employees would be white if the terminations were race-neutral was less than one in 10,000; and the probability of the racial composition changing as it did in Jordan's first 72 days, if the decisions had been made randomly, was less than one in one million.

B.

Jordan claims the court abused its discretion in admitting into evidence EEOC determinations stating the evidence it had reviewed supported Plaintiffs' race-discrimination claims. He relies on Federal Rule of Evidence 403, claiming their relevance was far outweighed by the danger of unfair prejudice. Jordan contends the jury could have given the determinations greater-than-appropriate weight because they had the imprimatur of Government approval.

Evidentiary rulings are reviewed for abuse of discretion. *E.g.*, *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 423 (5th Cir. 2006). Even if an abuse of discretion is found, the error will be considered harmless unless a substantial right of the complaining party was affected. *E.g.*, *Compaq Computer Corp. v.*

11

*Ergonome Inc.*, 387 F.3d 403, 408 (5th Cir. 2004); *see* FED. R. EVID. 103(a).

As a general rule, "EEOC determinations and findings of fact, although not binding on the trier of fact, are admissible as evidence in civil proceedings as probative of a claim of employment discrimination". *McClure v. Mexia Indep. Sch. Dist.*, 750 F.2d 396, 400 (5th Cir. 1985). Jordan has not shown, pursuant to Rule 403, how the EEOC determinations at issue were unduly prejudicial. Accordingly, there was no abuse of discretion.

C.

As noted, Jordan's transition team created a cultural-diversity report (CDR) as part of its report, which provided that, within the first 100 days of Jordan's administration, the staff's racial composition should reflect that of Orleans Parish. In instructing the jury, the district court stated it had found the CDR constituted an *invalid* affirmative action plan (AAP). Jordan objected to such a characterization in a pre-trial motion in limine and in his post-trial JMOL motion. He contends the district court's instructing the jury that the CDR was an AAP requires a new trial.

We review *de novo* the district court's, as a matter of law, characterizing the CDR as an AAP. *E.g.*, *Water Craft Mgmt. LLC v. Mercury Marine*, 457 F.3d 484, 488 (5th Cir. 2006). (Jordan does

*not* contend that, if the CDR is held to be an AAP, the district court erred in finding it an *invalid* AAP.)

Our court has not defined the precise contours of an AAP. Nevertheless, case law reveals AAPs have common characteristics. An AAP usually gives preferential treatment to historically disfavored and under-represented minorities. *Doe v. Kamehameha Schs./Bernice Pauahi Bishop Estate*, 470 F.3d 827, 843 (9th Cir. 2006), *cert. dismissed*, 127 S. Ct. 2160 (2007); *see also Blow v. City of San Antonio*, 236 F.3d 293, 295 (5th Cir. 2001) (AAP at issue established departmental goals for job groups with "significant minority or female underutilization" (internal quotation marks omitted)). An AAP may promote hiring workers from an under-represented race to eliminate racial imbalances in the employer's work force and the local work force. *See United Steelworkers of Am., AFL-CIO-CLC v. Weber*, 443 U.S. 193, 198 (1979). An AAP may focus on ensuring diversity; there is no requirement that it contain quotas or give preference to less-qualified minority applicants for jobs or promotions. *See Mlynczak v. Bodman*, 442 F.3d 1050, 1054 (7th Cir. 2006); *see also Messer v. Meno*, 130 F.3d 130, 133 (5th Cir. 1997) (AAPs at issue expressed the goal of "achiev[ing] a workplace balanced with a proportionate number of minorities and women in the *workforce*" (internal quotation marks omitted)).

13

Jordan claims the CDR is not an AAP because it does not meet the requirements for AAPs established by the Office of Federal Contract Compliance. Those requirements apply, however, only to nonconstruction contractors. 41 C.F.R. § 60-2.1(a) (2000).

The CDR has characteristics AAPs generally have, as described above. It compares the racial composition of several divisions within the DA's office with that of the City of New Orleans. It then recommends: within the first 100 days of Jordan's taking office, "[t]he racial composition of staff at levels [sic] should be more reflective of the Parish's population"; and his office should "[c]reate culturally diverse staff reflective of the ratios of the current population". This recommendation mirrors Jordan's above-described campaign promise to make his office reflect New Orleans' diversity. Furthermore, Jordan referred at trial to the CDR as a "plan".

The district court did not err in instructing the jury that the CDR was an AAP. Despite the CDR's lack of specific means for achieving the desired race ratios, it sufficiently evidences, for the purpose of its being considered an AAP, a plan to focus on race in employment decisions and an intent to achieve a desired racial balance.

D.

Jordan next contends damages testimony should have been excluded, pursuant to Federal Rules of Evidence 402 and 403, until after Plaintiffs proved discrimination. He claims the district

14

court's failure to do so resulted in prejudicial error.  Plaintiffs respond that Jordan failed to object to the testimony's admission at trial and, because he cites no authority for his claim, basically concedes the issue.

Jordan did *not* object at trial.  As a result, our review is only for plain error.  *E.g.*, **Septimus v. Univ. of Houston**, 399 F.3d 601, 606-07 (5th Cir. 2005).  This standard of review requires a clear or obvious error that affects substantial rights.  *E.g.*, **Fiber Sys. Int'l, Inc. v. Roehrs**, 470 F.3d 1150, 1158 (5th Cir. 2006).  Even if these criteria are met, we have discretion whether to grant relief; generally, it is accorded only when failure to do so would seriously affect the fairness, integrity, or public reputation of judicial proceedings.  *Id.*

Failure to bifurcate a race-discrimination trial in which evidence of damages is introduced prematurely, before discrimination has been proven, does not result in a "fundamental miscarriage of justice".  **Bunch v. Bullard**, 795 F.2d 384, 390 (5th Cir. 1986) (internal quotation marks omitted).  Accordingly, Jordan's claim does not survive plain-error review.

E.

Section 102 of the Civil Rights Act of 1991 allows "a Title VII plaintiff who wins a backpay award [to] also seek compensatory damages for 'future pecuniary losses, *emotional pain*, suffering, inconvenience, *mental anguish*, loss of enjoyment of life, and other

15

nonpecuniary losses'". ***Landgraf v. USI Film Prods.***, 511 U.S. 244, 253 (1994) (emphases added) (quoting 42 U.S.C. § 1981a(b)(3)). The Louisiana Employment Discrimination Law and 42 U.S.C. § 1981 similarly allow compensatory damages. LA. REV. STAT. ANN. § 23:303(A); ***Arguello v. Conoco, Inc.***, 207 F.3d 803, 809 n.9 (5th Cir. 2000). Compensatory damages are reviewed for abuse of discretion. *E.g.*, ***Oden v. Oktibbeha County, Miss.***, 246 F.3d 458, 470 (5th Cir. 2001).

Compensatory damages, ranging from $250 to $13,500, were awarded 35 Plaintiffs. Jordan challenges the awards on the grounds insufficient proof of actual injury was submitted. Plaintiffs respond: this court has held a plaintiff's testimony alone is sufficient support for an emotional damage claim; and they testified to emotional harm, at the requisite level of specificity, caused by their termination.

Compensatory damages for emotional distress and other intangible injuries are not presumed from the mere violation of constitutional or statutory rights, but require specific individualized proof, including how each Plaintiff was personally affected by the discriminatory conduct and the nature and extent of the harm. ***Allison v. Citgo Petroleum Corp.***, 151 F.3d 402, 416-17 (5th Cir. 1998); *see also* ***Vadie v. Miss. State Univ.***, 218 F.3d 365, 376 (5th Cir. 2000). It is true that, "[i]n many cases, 'a claimant's testimony alone may not be sufficient to support

16

anything more than a nominal damage award'". *Oden*, 246 F.3d 458, 470 (5th Cir. 2001) (quoting *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 938 (5th Cir. 1996)). Nevertheless, corroborating testimony and medical evidence is *not* required in *every* case involving compensatory damages. *E.g.*, *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1046-47 (5th Cir. 1998).

For example, in *Forsyth v. City of Dallas*, 91 F.3d 769, 774 (5th Cir. 1996), involving a 42 U.S.C. § 1983 retaliation claim, this court upheld: a $100,000 emotional damages award to a plaintiff who testified she suffered depression, weight loss, intestinal problems, and marital problems, had to be sent home from work because of her depression, and had to consult a psychologist; and a $75,000 emotional damages award to a plaintiff who testified he suffered depression, sleeplessness, and marital problems. Similarly, in *Oden*, 246 F.3d at 470-71, this court upheld, against a sufficiency-of-the-evidence challenge, Title VII compensatory damages awarded the plaintiff based on evidence "includ[ing] his testimony concerning stress, sleeplessness, betrayal, and shame". *See also* *Migis*, 135 F.3d at 1046 (upholding compensatory damages awarded Title VII plaintiff where mental-anguish evidence consisted solely of plaintiff's testimony "that her termination, which came without warning, was 'a major inconvenience,' and that she suffered low self-esteem 'not only from not having worked but from getting terminated and not offered a position [she] thought [she] was

17

qualified for....'", and that she suffered anxiety attacks, financial hardship, marital hardship, major stress, sleeplessness, and crying).

At trial, each Plaintiff testified about the personal difficulties experienced after being terminated. Common complaints included, *inter alia*, stress, sleeplessness, strained relationships with family members, loss of appetite or weight gain, depression, loss of self-confidence, and worsening physical problems, such as high blood pressure, a bleeding ulcer, and hair loss.

Such complaints are included as possible manifestations of emotional harm in EEOC guidelines. EEOC Policy Guidance No. 915.002 § II(A)(2) (14 July 1992) (manifestations of emotional harm include "sleeplessness, anxiety, stress, depression, marital strain, humiliation, emotional distress, loss of self esteem, excessive fatigue, ... a nervous breakdown[,] ... ulcers, gastrointestinal disorders, hair loss, or headaches"); *see also Patterson*, 90 F.3d at 940 (overturning award for emotional damages where plaintiff presented no testimony of any manifestations of harm listed in the EEOC policy statement). Although Jordan implicitly questions the veracity of Plaintiffs' testimony, by noting the "potential abuse" of not requiring corroborating testimony when symptoms match those listed in the EEOC guidelines, the credibility of Plaintiffs' testimony was a matter for the jury, whose judgment is represented by the varying damages amounts.

A life span development psychologist testified regarding his examination of three Plaintiffs party to this appeal. Based on his examination of these persons for 45 minutes to one hour, he described the symptoms they complained of and their likelihood of being due to job loss. He noted their being upset about losing their jobs, depression, weight gain, anxiety, financial difficulty, and sleeplessness. He described such complaints as "common of people who lose their jobs".

The jury awarded a range of compensatory damages, which are lower than awards we have previously upheld based only on a plaintiff's testimony. *E.g.*, **Forsyth**, 91 F.3d at 774. The compensatory-damages awards appear to be sufficiently supported by the type and degree of harm each Plaintiff testified to having experienced. For example, one Plaintiff, awarded $250, testified she was "very angry"; suffered anxiety attacks, for which she was prescribed medication, until she obtained permanent employment elsewhere; and had a difficult relationship with her spouse, who had recently been diagnosed with an incurable muscle disease. Another Plaintiff, awarded $1250, testified to being stunned and numb for two weeks following his termination, losing some sleep, and having difficulty adjusting to a change in administration at his new workplace due to his negative experience at the DA's office. Another Plaintiff, awarded $10,500, testified to ongoing sleep and appetite loss, depression, problems with his wife, and

19

anger.  Another, awarded $13,500, testified regarding his inability to visit his son before he went to Iraq due to financial hardship, his wife's having to return to full-time work, and ongoing sleeplessness, depression, and irritability.

"Judgments regarding noneconomic damages are notoriously variable".  *Forsyth*, 91 F.3d at 774.  The jury could have reasonably considered these individual complaints as justifying the Plaintiffs' varying and non-excessive compensatory damages.  Jordan has not shown an abuse of discretion.

### F.

Jordan contends that, during closing argument, Plaintiffs' counsel made improper statements that misled the jury and influenced the verdict, providing grounds for a new trial.  Because Jordan failed to object to any of the statements at trial, our review is again only for plain error.  *United States v. Hitt*, 473 F.3d 146, 161 (5th Cir. 2006), *cert. denied*, 127 S. Ct. 2083, 127 S. Ct. 2893 (2007).

"Improper argument warrants reversal when, 'taken as a whole in the context of the entire case, [it] prejudicially affect[ed] substantial rights of the defendant.'"  *Id.* at 161 (quoting *United States v. Corona*, 551 F.2d 1386, 1388 (5th Cir. 1977)) (alterations in original).  *See also Daniel v. Ergon, Inc.*, 892 F.2d 403, 411 (5th Cir. 1990) ("In determining the effect of statements made

20

during closing argument, we consider the record as a whole and not merely isolated remarks.").

1.

Jordan claims Plaintiffs' counsel improperly testified as an expert by advising the jury in his opening closing argument that "[t]he EEOC doesn't find cause that often"; and, in rebuttal, stating, "I used to be a lawyer with the EEOC", and providing personal knowledge of EEOC processes not in the record. For the first contested comment, Jordan's counsel responded, however, in closing argument that the EEOC "litigate[s] all the time [and] ... could have brought this case themselves. There are lawyers at the Justice Department who do just that. If the EEOC felt strongly about this case, where were they when it came time to litigate it?". This statement was equally outside the record and offered a counterpoint to Plaintiffs' counsel's statement concerning the EEOC's not often finding cause.

Further, viewing in context Plaintiffs' counsel's statement in his rebuttal closing argument (about being an EEOC lawyer), it is clear he was disputing Jordan's counsel's statement. Plaintiffs' counsel said:

> Let's talk about the EEOC determinations. Counsel misrepresented. The EEOC does not file lawsuits in regard to public entities. The Justice Department in Washington does that with regard to public entities. I used to be a lawyer with the EEOC. And I'm going to tell you this. The facts of the EEOC charges are these. [A Plaintiff] went to the EEOC on a Friday afternoon, filed her charge, and they

21

> dismissed it Tuesday without doing any
> investigation. Reopened it and investigated
> it for a year. And found cause. Counsel
> didn't tell you that.

These comments reflect a back-and-forth between opposing viewpoints. Although obviously improper, they constituted harmless error. Moreover, they certainly did not impact the integrity of the judicial process.

2.

Regarding the above quote from rebuttal closing argument, Jordan claims Plaintiffs' counsel accused his counsel of dishonesty concerning the EEOC investigation and thereby improperly weakened the credibility of Jordan and his counsel. As noted, Plaintiff's counsel's statement on rebuttal closing argument, that the defense misrepresented the EEOC's process of filing lawsuits and handling of Plaintiffs' charges, followed Jordan's argument about the EEOC litigation and investigation processes. Plaintiff's counsel's comment was brief and responsive to Jordan's. It did not affect Jordan's substantial rights. As a result, it too falls short on plain-error review.

3.

Finally, Jordan claims Plaintiffs' counsel improperly testified to expert-witnesses hearsay statements not introduced in evidence, by stating:

> Remember. Let me tell you this: It doesn't
> take a Ph.D. in industrial psychology to
> figure out those numbers. And that's what Dr.
> McDaniel told me the first day I talked to

him. Do you know what else? Do you know what Dr. Kenny told them? You didn't hear it, but let me tell you what he told them. I can't touch the firing decisions. That's why this has got to be a hiring case.

These comments relating to the expert witnesses were again obviously improper; but, they were of limited duration. Viewed in the context of the entire case, they likewise do not meet the plain-error standard because they did *not* affect Jordan's substantial rights.

## G.

Plaintiffs seek attorney's fees for their successful defense of this appeal. "A long and consistent line of Fifth Circuit precedent allows awards of attorneys' fees for both trial and appellate work." *Norris v. Hartmarx Specialty Stores, Inc.*, 913 F.2d 253, 257 (5th Cir. 1990). Accordingly, we award Plaintiffs attorney's fees for this appeal and remand to district court for the amount to be determined.

## III.

For the foregoing reasons, the judgment is **AFFIRMED**; and this matter is **REMANDED** to district court for determination of attorney's fees.

*AFFIRMED and REMANDED*