# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 18, 2024

Lyle W. Cayce
Clerk

No. 23-30732

———————————

Darrell Eugene Clark; Reginald David Cooper;
Cedric Linbert Green,

*Plaintiffs—Appellants*,

*versus*

City of Alexandria; Daryl Louis Terry;
Jarrod Daniel King; Patrick Ramon Vandyke;
Christopher Louis Cooper,

*Defendants—Appellees*.

———————————

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 1:20-CV-1581

———————————

Before Jones, Smith, and Ho, *Circuit Judges*.

Jerry E. Smith, *Circuit Judge*:

Cedric Green, Darrell Clark, and Reginald Cooper, one demoted and two former police officers, appeal a litany of rejected employment discrimination claims against the City of Alexandria. The district court granted summary judgment to the city primarily because the plaintiffs failed to present competent summary judgment evidence. We affirm: Plaintiffs' citations to the complaint are not evidence, and the proffered evidence cannot hurdle

No. 23-30732

summary judgment's evidentiary bar.

## I.

This case arises out of an alleged thirty-plus-year history of "intentional and systemic" discrimination against black officers in the Alexandria Police Department ("APD").[1] Clark, Cooper, and Green spent 28, 32, and 30 years, respectively, with APD before Clark's and Cooper's terminations and Green's demotion.[2] They allege that over those years, many officers and supervisors—including Jerrod King, the Chief of Police between May 2018 and November 2020—repeatedly demeaned, belittled, and attacked them on the basis of their race.

The APD Chief is an appointed position, but the remaining command staff positions are seniority-based. By 2019, black officers held each of those seniority-based positions. In one of the complained-of statements, at least one officer referred to that all-black command staff as the "colored coalition." And, according to the plaintiffs, King began to circumvent his command staff at roughly the same time, relying instead on white officers further down the pecking order.

Fed up with King's behavior, Clark, Cooper, and Green filed HR complaints against King in 2019, alleging harassment and a hostile work environment. The city pulled King off duty for a few months to investigate those claims.

---

[1] Many of the plaintiffs' factual assertions are relevant to specific claims discussed below. But this section will lay out the main details.

[2] Clark had reached the level of Lieutenant and Commander of the APD Narcotics Division before being fired; Cooper reached Assistant Chief before his termination; and Green reached Deputy Chief before returning to being a Lieutenant upon the defunding of the Deputy Chief position and his subsequent demotion to Sergeant.

No. 23-30732

In March 2020, during King's leave, the plaintiffs filed a report with the FBI unrelated to their complaints against King. They had become aware of an incident involving another APD officer, Kenny Rachal, who had beat, pistol-whipped, and choked an unarmed black suspect, Daquarious Brown. In plaintiffs' view, APD had not investigated the incident sufficiently, and they believed that the failure was indicative of APD's even deeper racial issues.

Shortly after their FBI report, King returned to active duty. On his return, APD began to investigate plaintiffs over allegedly minor or fictitious infractions, proceeding to find novel justifications to discipline them.[3] Armed with the results of those investigations, the city fired Clark and Cooper and demoted Green.[4]

The city justified Clark's firing by claiming he had misused the police department's Thinkstream platform, accessing it for "non-APD purposes on multiple instances" in violation of "well-established rules and regulations . . . and state statutes."[5] Allegedly, he had run inquiries on King and fourteen other individuals for various personal purposes, despite that APD Rule #609.5 expressly prohibited such personal inquiries.

The city dismissed Cooper because he had impermissibly disseminated police information and used or accessed city resources, equipment, and/or authority. Specifically, in an interrogation, Cooper had denied providing city information to anyone outside the department—but a polygraph

---

[3] They had relatively little, if any, disciplinary history.

[4] APD terminated Clark on June 25, 2020. A month later, it let Cooper go. Then, over six months later, it demoted Green.

[5] Thinkstream provided access to the Louisiana Law Enforcement Telecommunications System ("LLETS"), and the FBI's National Crime Information Center ("NCIC").

showed that to be a lie—and he had improperly contacted the mother of a person involved in a lawsuit against the city.

Finally, the city demoted Green because he had given Cooper, by then a former officer, an employment list containing the home address and personal phone number of every APD officer—and then he lied about it in an investigation. He recanted that lie in the pre-polygraph interview several days later, but he had not volunteered the correction before then.

Plaintiffs believed that the investigations were mere pretexts to justify their firings and demotion, describing them as the culmination of years of discrimination and as retaliation for their HR complaints and FBI report. So, they filed unsuccessful discrimination claims with the EEOC. Plaintiffs sued, alleging a litany of unlawful actions by a variety of actors.[6] They described the discrimination in APD as "persistent, historical, and widespread" such that it became "so common and well-settled as to constitute a custom that fairly represent[ed] the APD's policy."

In a thorough and detailed 34-page order, the district court granted summary judgment to the defendants in full. Clark, Cooper, and Green appeal, maintaining only their claims against the city.

## II.

We review summary judgments *de novo*, viewing all facts and drawing

---

[6] Several plaintiffs and defendants included in the Third Amended Complaint ("TAC") are not on this appeal. Clark, Cooper, and Green also brought a wiretapping claim under 18 U.S.C. § 2511 that they do not pursue on appeal. Their complaint included (1) unlawful discrimination under 42 U.S.C. §§ 1981 and 1983, Title VII, the Louisiana Employment Discrimination Law ("LEDL"), La. R.S. 23:332, and the Louisiana Human Rights Act, La. R.S. 51:2231; (2) a hostile work environment under Title VII; and (3) retaliation in violation of the First and Fourteenth Amendments, § 1983, and the Louisiana whistleblower statute, La. R.S. § 23:967.

all inferences in the light most favorable to the nonmoving party. *Brandon v. Sage Corp.*, 808 F.3d 266, 269–70 (5th Cir. 2015) (citations omitted). We affirm a summary judgment where the nonmovant shows "no genuine dispute as to any material fact . . . ." Fed. R. Civ. P. 56(a). To make a showing of a genuine dispute of material fact, "the party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim."[7] "A fact is material only if its resolution would affect the outcome of the action, and an issue is genuine only if the evidence is sufficient for a reasonable party to return a verdict for the nonmoving party." *Brandon*, 808 F.3d at 269 (internal quotation marks and citation omitted).

### III.

Plaintiffs assert the court erred by granting summary judgment on the (A) hostile work environment; (B) retaliation; (C) whistleblower; (D) discrimination; and (E) *Monell* claims. We address each in turn.

### A. The Hostile Work Environment Claims

"A hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice."[8] To succeed, the plaintiff must show that

> (1) the employee belonged to a protected class; (2) the employee was subject to unwelcome harassment; (3) the harassment

---

[7] *Diaz v. Kaplan Higher Educ., L.L.C.*, 820 F.3d 172, 176 (5th Cir. 2016) (emphasis omitted) (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)); *see also Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 824 (5th Cir. 2022); *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014).

[8] *Wantou v. Wal-Mart Stores Tex., L.L.C.*, 23 F.4th 422, 433 (5th Cir. 2022) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 106 (2002)), *cert. denied*, 143 S. Ct. 745 (2023).

was based on the protected class; (4) the harassment affected a "term, condition, or privilege" of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action.[9]

Harassment generally takes the form of "discriminatory intimidation, ridicule, and insult" that rises to the level of "hostile or abusive."[10] But an "environment so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers, merely presents an especially egregious example of harassment. It does not mark the boundary of what is actionable." *Harris*, 510 U.S. at 22 (cleaned up).

"For harassment to affect a term, condition, or privilege of employment, it 'must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Wantou*, 23 F.4th at 433 (quoting *West*, 960 F.3d at 741–42). The plaintiff must show subjective awareness of the hostility or abusiveness and that his awareness is objectively reasonable. *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).

We consider "[t]he totality of the employment circumstances [to] determine[] whether an environment is objectively hostile." *West*, 960 F.3d at 742 (citing *Harris*, 510 U.S. at 23). Relevant considerations include (1) "the frequency of the discriminatory conduct"; (2) "its severity"; (3) "whether it is physically threatening or humiliating, or a mere offensive

_____

[9] *Bye v. MGM Resorts Int'l, Inc.*, 49 F.4th 918, 923 (5th Cir. 2022), *cert. dismissed*, 143 S. Ct. 1102 (2023) (cleaned up); *see also Wantou*, 23 F.4th at 433 (quoting *West v. City of Hous.*, 960 F.3d 736, 741–42 (5th Cir. 2020)).

[10] *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 22 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).

utterance"; and (4) "whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. "No single factor is determinative[,]" but "a single incident . . ., if sufficiently severe, could give rise to a viable Title VII claim as well as a continuous pattern of much less severe incidents of harassment." *EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 400 (5th Cir. 2007) (citations omitted).

### 1. *Clark*

The court rejected Clark's claims because, of his nine allegations, (1) most bore no relation to race; (2) two involved harassment directed at someone other than him; and (3) the one comment King made that related to race and was directed, at least in part, at Clark, could not, standing alone, establish a claim of a hostile work environment sufficient to survive summary judgment.

Clark responds by pointing to several claims in the complaint about the use of racial epithets and to his deposition, where he asserted various claims of race-based hostility. But "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden in a motion for summary judgment."[11] So, as the city points out, Clark's complaint does not count as summary judgment evidence, nor do his motions or responses. *See Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).

Because Clark's motion for summary judgment rests almost entirely on his complaint, the court may have construed Clark's claims too gener-

---

[11] *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002) (internal quotation marks and citation omitted); *see also Ragas*, 136 F.3d at 458 (discussing the *Celotex* trilogy's summary judgment standards and quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)).

ously. Still, even if we do the same and consider his affidavit and deposition, he has not provided sufficient evidence of a hostile work environment.

Clark's affidavit contains the following broadly-described claims: (1) that white officers received better positions than black officers; (2) that white officers received better uniforms and equipment than black officers; (3) that white officers were punished less severely than black officers, *e.g.*, Sergeant Nassif's demotion was overturned after he called a Patrolman "monkey boy"; (4) that Clark had been unfairly dismissed; and (5) that racial bias led to circumvention of his commands. Similarly, Clark's deposition asserts that (6) King permitted the "colored coalition" comment; (7) APD did not hire or promote many black officers; (8) King circumvented those black officers high up in the chain of command, including Clark; (9) King "allowed Van Dyke [sic] and Cooper," two other black officers (and since-dismissed defendants), to verbally attack Clark while King "stood there and grinned at it"; (10) King held a meeting and looked at Clark during it in a "harassing" way; and (11) Clark had been terminated for an activity that other officers did and for which they "only got one-day's suspension."

Few of the allegations allege any kind of harassment. Most relevant is that King permitted an APD officer to make the "colored coalition" comment without reprimand. That comment was racially motivated, directed at Clark, and—as the district court noted—both "objectively and subjectively offensive." Much weaker is the verbal abuse Vandyke and Cooper inflicted on Clark, who offers no evidence that their words or actions carried any racial animus. Finally, Clark submits that King stared at him in a harassing way during King's first meeting back from his HR suspension. But King had perfectly understandable, non-racial, justifications for his "harassing stare"—King and Clark had not gotten along since King's time as a probationary sergeant, and then Clark had filed an HR complaint against King, leading to King's suspension. Whatever the merit or subject matter of the HR com-

plaint, the evidence supports that King singled out Clark for a "harassing stare" because of that complaint and their history, not because of Clark's race.

Combined, we find no reason to disturb the district court's reasoned and thoughtful analysis of Clark's claims. First, many of Clark's allegations fail to assert harassment. Second, of those allegations that rise to the level of harassment, Clark offers no evidence supporting a claim that they were racially charged.[12] Third, and finally, the remaining "colored coalition" and "monkey boy" allegations fail to rise to the level of a hostile work environment as required by our precedent.[13] The two statements are "unrelated instances of alleged harassment by different individuals," and, though highly demeaning, "were not physically threatening." *Price v. Valvoline, L.L.C.*, 88 F.4th 1062, 1067 (5th Cir. 2023). Instead, the one statement made about Clark, and the other made to and about someone else, fall more in the bucket of "offensive utterances." *Wantou*, 23 F.4th at 433 (cleaned up). And, finally, Clark proffers no evidence that those statements interfered with his ability to do his job.

In sum, Clark has not presented sufficient summary judgment evidence to establish a genuine dispute of material fact. Therefore, the court properly granted summary judgment on his hostile work environment claim.

––––––––––––––––––––––––––––

[12] *See Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 654 (5th Cir. 2012) (We "do not consider the various incidents of harassment not based on race.").

[13] *See Molden v. E. Baton Rouge Par. Sch. Bd.*, 715 F. App'x 310, 316 (5th Cir. 2017) (noting that our "standard for workplace harassment in this circuit is . . . high" (omission in original) (quoting *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 509 (5th Cir. 2003)); *see also Wantou*, 23 F.4th at 433; *White v. Gov't Emps. Ins. Co.*, 457 F. App'x 374, 381 n.35 (5th Cir. 2012); *Collier v. Dall. Cnty. Hosp. Dist.*, 827 F. App'x 373, 377–78 (5th Cir. 2020).

### 2. *Cooper*

The court similarly dismissed Cooper's claims, noting that several were thoroughly unrelated to race and two of the racially offensive comments did not affect a term, condition, or privilege of his employment. The court took more time to assess Cooper's allegation that an APD officer overtly referenced the KKK and called him the n-word. As Cooper recounts it, in 2014 or 2015 a white captain embarrassed Cooper (then at the lower rank of sergeant) by publicly suggesting he should not have made sergeant. Then, driving home the incident's racial component, one of the white sergeants in the room asked the captain to show Cooper "the silver dollar in [his] pocket."[14] After the captain left the room, one of the other sergeants shouted at Cooper "look out n*****, the Klan is getting bigger." Cooper contends that that incident, combined with the day-to-day racism he experienced over his long career, suffices to show a hostile work environment.

The district court accurately described that incident as "humiliating, highly offensive, and . . . undoubtedly warrant[ing] discipline." Still, one incident over Cooper's 30-year career with the APD—well before his promotion to Assistant Chief—suggested that it did not affect any term of his employment. So, Cooper had provided "insufficient evidence of severe or pervasive conduct altering the conditions of his employment."

We agree. Cooper never reported the silver-dollar incident to his superiors, HR, or the city. The event, severe as it was, occurred only once and did not seem "unreasonably [to] interfere[] with [his] work perfor-

---

[14] "The Silver Dollar Group was an offshoot of the Ku Klux Klan white nationalist terrorist group, composed of cells that took up violent actions to support Klan goals. The group was largely found in Mississippi and Louisiana and was named for their practice of identifying themselves by carrying a silver dollar." *Silver Dollar Group*, WIKIPEDIA, https://en.wikipedia.org/wiki/Silver_Dollar_Group (last edited Feb. 8, 2024).

mance." *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996) (citation omitted). Then, his remaining allegations largely generalize harassing statements and incidents that only occasionally centered on race. Those claims, though problematic, do not clear the bar of "conduct that is so severe and pervasive that it destroys a protected classmember's opportunity to succeed in the workplace." *Id.* (citing *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 593 (5th Cir. 1995)).

Therefore, the court properly granted summary judgment on Cooper's hostile work environment claim.

### 3. *Green*

The court likewise dismissed Green's claims of a hostile work environment. It explained that "[d]espite being offensive and warranting discipline, four of Green's five allegations relate to the harassment of someone other than Green[, so they] are of limited evidentiary value." Then, it declared that, despite the one "trunk monkey" comment directed at him, "Green does not allege harassment that is 'severe or pervasive' enough to 'affect a term, condition, or privilege' of his employment, particularly when considered against the backdrop of Green's roughly 30-year-long tenure with the APD and eventual promotion to Deputy Chief."

On appeal, Green disputes the court's weighing of the allegations of harassment of others and highlights some of the allegations he made in his affidavit. But our independent review confirms that Green presented insufficient summary judgment evidence to rescue his claim. Unlike Clark, Green at least identifies *some* valid summary judgment evidence, detailing several racist incidents. But, only one such harassing incident was directed at Green—the "trunk monkey" incident.[15] Even combining that with the dis-

_____

[15] The allegations that APD did not hire minority candidates and that King refused

criminatory "chicken and watermelon" incident,[16] Green's claim still lacks even the reprehensible statements and behaviors seen in Cooper's claim, and he presents no other competent evidence of repeated, low-level, racist behavior that would be necessary to raise his claim from occasional "offensive utterances" to an "abusive or hostile" environment. So, he has not shown a severe or pervasive enough hostile work environment under our precedent.[17]

Therefore, we affirm the summary judgment on Green's claim of a hostile work environment.

## B. The Retaliation Claims[18]

"As a general matter, the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (cleaned up). To succeed on a First Amendment retaliation claim, the plaintiff "must show that (1) he suffered an adverse employment decision; (2) his speech involved a matter of public concern; (3) his interest in commenting on matters of public concern outweighs the [d]efendant's interest in promoting efficiency; and (4) his speech motivated the adverse employment decision." *Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 601 (5th Cir. 2001) (cleaned up).

---

to reappoint Green because of insufficient loyalty are not allegations of harassment. Therefore, we need not address them.

[16] Green, in his affidavit, alleges that another black officer, "Vincent Parker, . . . had a watermelon left in his vehicle because he refused to purchase a dinner a white officer was selling. The white officer then brought a box of chicken to roll call and placed it in front of Officer Parker and stated 'I heard you people like chicken and watermelon.'"

[17] *See supra* note 13 (collecting cases).

[18] Plaintiffs pursue only a First Amendment retaliation claim, not a Title VII claim. So, we analyze only that claim.

Making that showing establishes a presumption of retaliation, but the defendant may still rebut it by showing "by a preponderance of the evidence that they would have come to the same conclusion in the absence of the protected conduct." *Id.* (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). A plaintiff may then "refute that showing by evidence that his employer's ostensible explanation for the discharge is merely pretextual." *Coughlin v. Lee*, 946 F.2d 1152, 1157 (5th Cir. 1991).

The court dismissed the plaintiffs' claims after making three findings: First, that the plaintiffs had not presented any direct evidence of retaliation. Plaintiffs do not challenge that ruling. Second, that the plaintiffs "have [not] identified any evidence as to *when* they allegedly reported this conduct to . . . the FBI or *when* the APD learned of this alleged contact." Thus, plaintiffs had not presented enough evidence "from which a jury could infer a causal connection between [plaintiffs'] contact with . . . the FBI and their respective adverse employment actions." Third, that the city had rebutted any *prima facie* case the plaintiffs may have established because the city presented legitimate, non-retaliatory justifications for each adverse action: (1) Clark misused Thinkstream, (2) Cooper failed a polygraph, and (3) Green lied during an Internal Affairs investigation.

Plaintiffs respond by citing—for the first time—Cooper's Pre-Disciplinary Hearing transcript, where Cooper stated that the plaintiffs had gone to the FBI in late March 2020.[19] And, as the plaintiffs claim, the retaliatory investigations began in April 2020. That sequence of events could

---

[19] As in the harassment section of their brief, plaintiffs rely extensively on the TAC. As in the harassment section of this opinion, we do not address those claims or citations because a complaint is not competent summary judgment evidence, and it is not the court's role to comb through the record to find support for their claims.

have created a plausible inference of causation.[20]

But, shortly after linking those, plaintiffs undercut their assertions entirely, pointing out that the city learned about the FBI report *during the investigations.* In other words, the plaintiffs' own evidence states that the FBI report did not motivate the investigations. They have presented a chronology that leads to the inescapable conclusion that King and APD were investigating Clark, Cooper, and Green before they found out about the report to the FBI.[21] Therefore, the claims of First Amendment retaliation cannot survive.

\*     \*     \*     \*     \*

Even if plaintiffs had shown that their "speech motivated the adverse employment decision[,]" establishing a presumption of retaliation, the city has rebutted it by offering non-retaliatory reasons, and the plaintiffs have not shown pretext. *Beattie*, 254 F.3d at 601. We address each plaintiff's failure in turn.

### 1. Clark

Clark contends that, after reporting to the FBI his suspicions of Rachal's alleged use of excessive force against Brown, APD subjected him to "a 60-day illegal investigation[,] . . . placed [him] on administrative leave, [and then] questioned, polygraphed, and terminated [him]." In that investigation, attorneys apparently accused him of "helping Daquarious Brown to

---

[20] *See Brady v. Hous. Indep. Sch. Dist.*, 113 F.3d 1419, 1424 (5th Cir. 1997); *see also Mooney v. Lafayette Cnty. Sch. Dist.*, 538 F. App'x 447, 454–55 (5th Cir. 2013).

[21] Plaintiffs point nowhere else but Cooper's Pre-Disciplinary hearing on July 15, 2020, to establish that the City knew of the FBI report. So, the district court likely correctly concluded that no jury "could infer a causal connection between Clark, Cooper, and Green's contact with . . . the FBI and their respective adverse employment actions."

obtain an attorney, giving information to others outside the APD, and aiding in a federal lawsuit against the [c]ity . . . ."  Later, APD interrogated Clark over his use of Thinkstream, accusing him "of using the system for personal use or gain in violation of state usage rules."  Eventually, the city fired him for that misuse of Thinkstream.  All of that, he claims, occurred in retaliation for his FBI report.

To rebut that claim of retaliation, the city relies on former APD Chief Ronney Howard's testimony that "[a]n APD officer found to have repeatedly misused the NCIC and LLETS information systems would be terminated regardless of any other reason."  But Clark contends that the investigations were pretextual, pointing to the fact that no "senior officer of the rank of Lieutenant and above [was] ever placed on administrative leave, investigated, polygraphed, or terminated" besides those who complained to HR about King's behavior.

Clark's pretext claim stretches a bridge too far.  In essence, it asks us to believe that other similarly situated high-ranking APD officers misused Thinkstream and that they were not fired.  Yet he offers no evidence whatsoever.  Instead, he pivots and suggests that two wrongs make a right, contending that another officer falsified other officers' Thinkstream exam data without punishment, so Clark's misuse was also permitted.

We disagree with that characterization.  Misuse for personal gain and misuse that enables officers to continue to use Thinkstream for legitimate investigations are apples and oranges.  Clark has presented no evidence of any similarly situated officers to rebut the city's non-retaliatory justification.

### 2. Cooper

To allege pretext around his firing for lying during a polygraph, Cooper points exclusively to his and other plaintiffs' testimony that "APD's use of polygraphers was unreliable and motivated by retaliation, as well as

alleging the general unreliability of polygraphs." That self-serving testimony nowhere suggests that the investigation into his improper activities was pretextual[22]—nor has he cited any evidence suggesting his activities were proper.

In other words, Cooper offers no evidence at all. Further, as the city notes, the Louisiana Supreme Court has permitted the use of polygraph results in civil service disputes. *See Evans v. DeRidder Mun. Fire*, 815 So. 2d 61, 66–69 (La. 2002).

Therefore, Cooper has not rebutted the city's non-retaliatory justification for his firing or shown pretext.

### 3. *Green*

Green recounts a litany of activities unsupported by summary judgment evidence—but repeatedly referencing the TAC—before finally asserting that "there is no evidence [he] lied . . . as he explained that the variance in his statements were [sic] due to his having . . . review[ed] his notes and refresh[ed] his memory."

We reject that specious claim. Green did not come forward to correct the record on his own; instead, he just changed his tune in a later interrogation, in the face of a polygraph. Either he lied the first time, or he lied the second, but either way, he lied. The city has offered a rational, nonretaliatory reason for his demotion, and Green's repeated claim that whether he lied presents a genuine dispute of material fact holds no water.

---

[22] *See Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 369 (5th Cir. 2021) ("[T]his court has held that a plaintiff's summary judgment proof must consist of more than 'a mere refutation of the employers legitimate nondiscriminatory reason.' 'Merely disputing' the employer's assessment of the plaintiff's work performance 'will not necessarily support an inference of pretext.'" (internal citations omitted)).

Otherwise, Green offers no new evidence that the dismissal for lying was mere pretext, and he certainly does not offer enough to rebut the city's nondiscriminatory justifications.[23]

### C.  The Whistleblower Claims

Plaintiffs' whistleblower claims rest on Louisiana's whistleblower statute, La. R.S. 23:967(A), which "provides protection to employees against reprisal from employers for reporting or refusing to participate in illegal work practices," *Hale v. Touro Infirmary*, 886 So. 2d 1210, 1214 (La. App. 4th Cir. 2004).  To succeed on such a claim, the plaintiffs must establish that (1) the employer "violated the law through a prohibited workplace act or practice;" (2) the plaintiff advised the employer of the violation; (3) the plaintiff "then refused to participate in the prohibited practice or threatened to disclose the practice;" and (4) the employer fired the plaintiff because of his "refusal to participate in the unlawful practice or threat to disclose the practice."  *Id.* at 1216.

The district court granted summary judgment on those claims in a footnote.  As it explained, the claims arise "from [the plaintiffs'] disclosure of this same alleged 'civil rights violation'" as the First Amendment claims.  But, for the same reasons that the First Amendment claims failed, specifically the failure to point to any causal chain, the whistleblower claims failed too.

The plaintiffs contend the court erred because, unlike in the case the district court relied on, *Hale*, the plaintiffs here "have not failed to establish a violation of the law . . . ."  Then, they rest on their First Amendment retaliation claims to support the causal chain for the whistleblower claims.

_____

[23] *Cf. id.* at 368–69 (requiring "substantial evidence" to make a showing of pretext and such a showing for "*each* of the nondiscriminatory reasons the employer articulates").

No. 23-30732

But, as discussed above, the plaintiffs have failed to establish a violation of the First Amendment.  And, as the city notes, plaintiffs have not shown any independent basis for reversal beyond the claimed First Amendment violation.  Therefore, we affirm the summary judgment on the whistleblower claims.

## D.  The Discrimination Claims

Clark, Cooper, and Green bring discrimination claims under Title VII, Section 1981, and the LEDL, each of which prohibits racial discrimination in employment.  The district court applied the three-part *McDonnell Douglass* analysis and held that none of the plaintiffs could satisfy the first part's fourth prong—that they were "either replaced by someone outside his protected group or . . . treated less favorably than similarly situated employees outside the protected group."  *See Johnson v. Iberia Med. Ctr. Found.*, 2023 WL 1090167, at *9 (W.D. La. Jan 27, 2023).  We agree.

Because the LEDL "is similar in scope to the federal prohibition against discrimination set forth in Title VII . . ., Louisiana courts have looked to the jurisprudence construing the federal statute . . . ."[24]

"A plaintiff who can offer sufficient direct evidence of intentional discrimination should prevail . . . .  However, because direct evidence of discrimination is rare, the Supreme Court has devised an evidentiary procedure that allocates the burden of production and establishes an orderly presentation of proof in discrimination cases."[25]  Under that "evidentiary proce-

---

[24] *Bustamento v. Tucker*, 607 So. 2d 532, 539 n.9 (La. 1992); *see also DeCorte v. Jordan*, 497 F.3d 433, 437 (5th Cir. 2007) ("Claims of racial discrimination in employment, pursuant to 42 U.S.C. § 1981 and the Louisiana Employment Discrimination Law, are governed by the same analysis as that employed for such claims under Title VII." (citations omitted)).

[25] *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 40 (5th Cir. 1996) (citing *Boden-*

18

dure," Clark, Cooper, and Green first must make a *prima facie* showing of discrimination by proving they "(1) are members of a protected group; (2) were qualified for the position at issue; (3) were discharged or suffered some adverse employment action by the employer; and (4) were replaced by someone outside their protected group or were treated less favorably than other similarly situated employees outside the protected group."[26] Only the fourth prong is at issue here.

The plaintiff does not meet the fourth prong where "his former duties are distributed among other co-workers." *Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 339 (5th Cir. 2021) (internal quotation marks and citation omitted). Additionally, if he claims less favorable treatment, he must "point to a comparator who was 'similarly situated' and received more favorable treatment under nearly identical circumstances." *Id.* at 340 (cleaned up).

Upon the plaintiff's making that *prima facie* showing, the defendant may rebut it "by articulating a legitimate, nondiscriminatory reason for [its] actions." *DeCorte*, 497 F.3d at 437 (citation omitted). If the defendant does so, the plaintiff must show that the defendant's "proffered reason is [merely] a pretext for discrimination." *Id.*

### 1. *Clark*

The district court rejected Clark's claim because the only fellow employee whom Clark identified as treated differently for his use of Think-stream, Corporal Fairbanks, was (1) supervised by someone other than Clark's supervisor, (2) two ranks lower than Clark, and (3) held a dramati-

---

heimer v. PPG Indus., Inc., 5 F.3d 955, 957 (5th Cir. 1993); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

[26] *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007) (cleaned up), *abrogated by Hamilton v. Dall. Cnty.*, 79 F.4th 494 (5th Cir. 2023).

cally different role.  In sum, the court found, "given the drastic differences in their positional status, Clark and Corporal Fairbanks are not similarly situated."[27]

Clark does not attempt to rebut that claim,[28] resting instead on his assertion that caselaw permits him to survive summary judgment if he proves that his discharge was on account of race.  Clark submits no such evidence, though.  He provides a detailed recount of his career and the events leading up to his termination, and he suggests that other officers' wrongful behavior went unpunished.  But he makes no showing that his termination had anything to do with race.  In essence, he presents nothing more than a repackaging of his hostile work environment claim.  That claim failed, and so too does this one.[29]

## 2. *Cooper*

The court granted summary judgment because Cooper provided no evidence that he was either replaced outside his protected group or treated less favorably than similarly situated employees outside the protected group.  Like Clark, Cooper contends that the history of racism in APD and King's "disdain for commanding black officers" show that his termination was motivated by race.

But Cooper, also like Clark, offers no tie between the asserted daily racism and his termination.  Like Clark, he cannot show that he was replaced by someone outside of his protected group—he was replaced by a black

---

[27] *See Saketkoo v. Adm'rs of Tulane Educ. Fund,* 31 F.4th 990, 999 (5th Cir. 2022); *Ernst*, 1 F.4th at 340; *Hinga v. MIC Grp., L.L.C.*, 609 F. App'x 823, 827 (5th Cir. 2015).

[28] He would fail if he tried.

[29] Even if Clark had made out a *prima facie* claim, he makes no independent attempt to show pretext.  For the same reasons his pretext claims failed earlier, they would fail here.

woman. Further like Clark, he asserts no evidence that the city's claimed reasons for firing him were pretextual.

Because Cooper does not tie any of the alleged racism to his termination, and because Cooper fails to rebut the city's nondiscriminatory justification for firing him, we affirm the summary judgment.

### 3. *Green*

The court granted summary judgment on Green's discriminatory demotion claim because "like Cooper, Green has not provided evidence indicating that he was replaced outside his protected group or treated less favorably than similarly situated employees outside the protected group with respect to his demotion." Instead, "[i]t is undisputed that . . . Green was replaced with a black man."

On appeal, Green makes no new evidentiary contentions, relying instead on the previously "alleged significant evidence that APD housed an environment of race-based harassment and discrimination that affected every aspect of a black officer's employment." Like Clark and Cooper, though, he makes no effort to tie that discrimination to his demotion. Like Clark and Cooper, Green also alleges that the city has presented only a pretextual justification for his demotion, but he does not even attempt to make a showing of "substantial evidence." *Jones*, 8 F.4th at 369. He relies on the same claims he made earlier, and they fail here just as they did there.

### E. The *Monell* Claims

We turn to the *Monell* claims.[30] To hold a city or municipality liable

---

[30] A *Monell* claim is a § 1983 claim against a local government for "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts [an] injury" in violation of the Constitution, as incorporated against the locality by the Fourteenth Amendment.

for the actions of its officers, a plaintiff must demonstrate "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)." *Newbury v. City of Windcrest*, 991 F.3d 672, 680 (5th Cir. 2021) (internal quotation marks and citation omitted).

The district court dismissed the *Monell* claims for lack of evidentiary support of specific acts of racial discrimination by the city, much less any evidence of a discriminatory policy or custom. On appeal, the plaintiffs barely brief the issue, asserting nothing new, except that they faced discrimination so widespread in "hiring, promoting, and disciplining" that it had to have been a custom. The city responds by noting that the plaintiffs make several allegations but point to effectively no evidence, and they make no legal claim. Plaintiffs do not attempt to remedy those infirmities in reply.

Without anything more to go on, we revert to the above analysis of the discrimination claims. The plaintiffs show no causation between any of the alleged racism and their negative employment outcomes, and they fail to establish a policy or practice that unconstitutionally deprived them of their jobs. There must be some connection between those bad acts and whatever lost property interest plaintiffs are asserting. Plaintiffs have presented none.

Therefore, we affirm the summary judgment for the city on the *Monell* claims.

*        *        *        *        *

Plaintiffs have alleged numerous discriminatory actions and statements over the course of decades. But they have only alleged them. Their reliance on the complaint is insufficient to overcome the summary judgment

---

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 695 (1978).

standard.  Therefore, we reject their claims of a hostile work environment, First Amendment retaliation, violation of Louisiana's whistleblower law, workplace discrimination, and *Monell* violations.

The summary judgment is AFFIRMED.